# CALIFORNIA STATE TELEGRAPH CO. v. ALTA TELEGRAPH CO. et al.

EXCLUSIVE franchises and privileges may be conferred by the Legislature upon persons or corporations, and no restriction upon this power is imposed by the State Constitution except as to the particular privileges specified therein.

The Act of May 3d, 1852, granting to Allen & Burnham the exclusive right to a line of telegraph between Sacramento and San Francisco, is constitutional.

Corporations formed under the general law have the power to purchase and hold an exclusive franchise or privilege granted by the Legislature to an individual and his assigns.

A corporation may receive from the Legislature a direct grant of special privileges and franchises.

The provision in the Act of May 3d, 1852 (granting to Allen & Burnham the exclusive right to a telegraph line between San Francisco and Sacramento), that "no existing law shall be so construed as to conflict or interfere with the provisions of this act," did not operate as a repeal of the general corporation law so far as to take away the right of forming corporations to build lines between those cities, but only to subject subsequent builders to the prior exclusive privileges of the grantees.

The power of a corporation, by the law under which it is created, to purchase a particular character of property cannot be questioned in an action between it and another corporation or person. It is a question between the corporation and the State, to be determined in a proceeding by the latter for a forfeiture. —COPE, C. J.

APPEAL from the Twelfth Judicial District.

The facts are stated in the opinion. The only portions of the Act of May 3d, 1852, material to the decision, are the first and second sections, as follows:

" Sec. 1. The right and privilege is hereby granted to Oliver E. Allen and Clark Burnham, or their assigns, to construct and put in operation an electro-magnetic telegraph line from the City of San Francisco to the City of Marysville, by the way of the cities of San José, Stockton, and Sacramento, with the right of way over any lands belonging to this State, and on or along any streets, roads, or highways, or across any stream or streams; *provided,* they do not obstruct the same, and no person or persons shall be allowed to locate, or construct, or run any telegraph line, or any portion thereof, within a half a mile of the line or route selected by the said Allen & Burnham, or their assigns, except that when within half a mile of any incorporated city the proprietors of any similar line of telegraph may enter said city and depart therefrom, making their station therein within twenty yards of the station of said Allen & Burnham, or their successors, for the term of fifteen years; *provided,* that the said above named parties or their assigns, shall within eighteen months from the passage of this act, construct and put in operation a telegraph line from the City of San Francisco to the City of Marysville, by the way of San José, Stockton, and Sacramento; *provided,* also, that this act shall not prohibit the construction of local side lines. But lines shall not be constructed nor offices established so as to do business directly or indirectly between the cities aforesaid; but side lines may establish offices in said cities for the transmission of communications to and from the main line. This line shall be bound to do the business of said lines, and to transmit all dispatches in the order in which they are received, under the penalty of one hundred dollars, to be recovered, with costs of suit, by the person or persons whose dispatch is postponed out of its order as herein prescribed; *provided,* however, that an arrangement may be made with the proprietors or publishers of newspapers for the transmission, for the purpose of publication, of intelligence of general and public interest out of its regular order; and, *provided* further, that preference may be given to Sheriffs and other civil officers for transmission of intelligence for the detection and capture of criminals.

" SEC. 2. No existing law shall be so construed as to conflict or interfere with the provisions of this act; *provided*, that the owners of this line shall at all times conform to the present law of the State concerning telegraph companies, so far as it relates to the transmission of messages."

*N. Bennett, E. R. Carpenter*, and *S. Heydenfeldt*, for Appellant.

I.   The Act of the Legislature passed May 3d, 1852 (Compiled Laws, 259), conferring upon Allen & Burnham, or their assigns, the right to construct and put in operation a telegraph line between the points mentioned, with the exclusive privilege annexed thereto, is constitutional and valid.   An Act of the Legislature will never be declared unconstitutional and void except in a clear and plain case, and where there is an entire freedom from doubt.   (*Dartmouth College* v. *Woodward*, 4 Wheat. 625; *Cooper* v. *Telfair*, 4 Dall. 14; *Ex parte McCollum*, 1 Cowen, 564.)   The Legislature possesses all powers of a legislative nature, the exercise of which is not prohibited to it by the Constitution of the United States, or by the Constitution of this State.   (See opinion of Judges in *Winehamer* v. *The People*, 3 Kern. 390, 411, 428, 462, 452, 465, 476, 482, and 1 Cal. 65; 4 Id. 46; *Bennet* v. *Boggs*, 1 Bald. 74, 75; *Cochran* v. *Van Surley*, 20 Wend. 381; *Sharpless* v. *The Mayor, etc.*, 21 Penn. 149, 162.)   The Act of May 3d, 1852, above referred to, falling properly within the scope of legislative action, must be valid, and must have conferred upon Allen & Burnham the right claimed, unless the power to pass such act was taken from the Legislature either by the Constitution of the United States or by the Constitution of the State.   It is not claimed, and if it were, it would not be a proposition deserving of serious consideration that any such prohibition exists in the Constitution of the United States, and therefore, so far as respects such Constitution, the Legislature had the power to enact the statute of May 3d, 1852. Such act does not fall within the inhibition of any particular article, section, or clause, nor within the spirit and meaning of the entire body of the Constitution of the State, and that for the following reasons, to wit: 1st, there is no portion of the Constitution of the State which will be claimed to render such act unconstitutional, ex-

California State Telegraph Co. v. Alta Telegraph Co.

cept Secs. 31 and 33 of Art. 4; 2d, the act is not unconstitutional under those sections, unless it forms or creates a corporation; 3d, the act referred to does not form or create a corporation within the meaning of thoses sections of the Constitution.

The act is simply a grant to Allen & Burnham, or their assigns, in their individual character, and does not confer upon them, or either of them, a single characteristic of a corporation. Then how can it be contended that the act forms or creates them into a corporation and is therefore obnoxious to the prohibitions of the Constitution, and on this account unconstitutional and void? (See the masterly opinion of Mr. Senator Verplanck in *Warner* v. *Beers*, 23 Wend. 131, in which he analyses the constituent parts of a corporation with great subtilty as well as ability.)

II.    The Constitution does not forbid the granting of exclusive privileges either to natural persons or to corporations. The constitutional inhibition extends no further than to the formation or creating of corporations by special acts of the Legislature. It cannot, therefore, be said that the grant of an exclusive privilege to Allen & Burnham, or their assigns, did *ipso facto* create them a corporation and thereby infringes on the Constitution.

The Constitution merely declares that " corporations shall not be created by special act." This is the entire extent of the prohibition. A corporation can never be created by implication, except where there is no possible way of giving effect to an act or a grant otherwise than by holding it to constitute a corporation. (*Warren* v. *Beers*, 23 Wend. 175, 176.)

An instance is given in Dyer, 100, of a corporation by implication. It is thus stated: "As if the Crown should grant lands to ' The Men of Islington,' without saying to them and their successors, this was held to incorporate them forever for that purpose, for without such incorporation the grant would fail, and the continuous identity of the grantees is sufficient to build an implication upon." But that case is essentially different from the present case. There, the grant was made to a body of men, without specifying any one individual; here, the grant is made to individuals by name. There, a continuous succession in the " Men of Islington " was necessarily implied; here, the grant would descend to the heirs, administrators,

or executors of Allen & Burnham, or their assigns.   This case from Dyer, however, can have but little application in these days, for no such grants are made in the present times, and the law of corporations has been so much enlarged, modified, and refined since the decision of that case, that we may now with safety say that no such thing is known to our law as a corporation by implication.

When the object of a grant can as well be effected without instituting a corporate existence it will never be implied.   The presumption in cases of doubt is against such corporate · existence. (See *Pennsylvania R. R. Co.* v. *Canal Comm'rs*, 21 Penn. 9; Sedgwick on Con. and Stat. Law, 342; Angell & Ames on Cor. Secs. 77–79; *Stebbins* v. *Jennings*, 10 Pick. 187; *Tone* v. *Ash*, 10 B. & Cres. 349; *Medical Institute* v. *Patterson*, 1 Denio, 618; S. C. 5 Id. 618.)   These cases sustain the position that an Act of the Legislature will not be considered to create a corporation if there be any other mode by which the rights granted can be enjoyed.

III.   The Act of May 3d, 1852, is not objectionable on the ground of its conferring a monopoly on Allen & Burnham or assigns.   The Legislature has the power and the right in its discretion to grant exclusive privileges, or—which is the same thing— monopolies, in all cases where there is no constitutional objection. (See Sedgwick on Con. and Stat. Law, 625, 626.)

Now there is not in the Constitution of this State any prohibition, either express or implied, against the power of the Legislature to grant special privileges or monopolies.   This is a matter which is left by the Constitution entirely within the discretion and control of the Legislature.

If then there be no prohibitory clause in the Constitution, the Legislature, in the proper exercise of legislative power, may grant franchises, special privileges, monopolies.   The power to make such grant must necessarily reside somewhere, either in the sovereignty of the people themselves, or in the modified sovereignty of the Legislature acting in subordination to the Constitution.   To hold that, it would be necessary to apply to the people in their sovereign state for the grant of every franchise, special privilege, or which is the same thing, monopoly, would not meet the assent of any

man, lawyer, or layman; and hence it follows that the power must be vested in the Legislature, to be exercised by them as their sound discretion shall dictate.

The grant of the privilege to build a ferry, or a bridge, is a franchise, exclusive privilege, monopoly, of the same nature as the grant to Allen & Burnham. Does any one doubt the power of the Legislature to grant a bridge or ferry franchise with exclusive privileges?

In the Terms de Ley, 334, a ferry is called a liberty, and this liberty, synonymous with franchise, or exclusive privilege or monopoly, depends for its extent upon the terms of the grant (2 Dane's Abridg. 683; *Stark* v. *McGowan*, 1 Nott & McCord); and these franchises may be vested either in natural persons or in bodies politic, in one man or in many (10 Petersdorff's Abr. 53). But the same franchise that has been granted to one cannot be bestowed on another, for that would prejudice the former grant (10 Petersdorff's Abr. 53; also, 13 Viner's Abr. 513). Thus, as has been said, a ferry is an exclusive privilege or monopoly of the same nature as the grant to Allen & Burnham. (See also upon this same position, *Blissett* v. *Hart*, Willis 512; 1 Rolle's Abr. 140; Nuisance G. line 29; Comyn's Dig. Title Piscary, B; 1 Nott & M'Cord, 387.)

But cannot the Legislature grant a ferry privilege? That would seem to be unquestionable. If so, it may grant any other franchise, exclusive privilege, monopoly. The extent and duration of such franchise must in every case be left in the sound discretion of the Legislature. It is not to be presumed that they have or will abuse such discretion. If they do, we know of no remedy, in case no fraud has been practiced.

Franchises, such as fairs or markets in England, and ferries and bridges in both England and our own country, and I may add this telegraph franchise to Allen & Burnham, are founded on good and sufficient consideration; such as the expenditure of money in establishing and maintaining them for the convenience and business facilities of the public. They are all *publici juris*, and from the rights, liabilities, and duties of which they are compounded, results the notion of property in them. The right to receive money for the

use and enjoyment of those franchises, is recognized as property, and protected as property, both by the law of England and of this country, and a grant of them vests in the grantee a beneficial interest, which may be leased, sold, or incumbered by him.   These positions are sustained by the following authorities: (Maule & Selwyn, 247; 1 Crumpton & Jervis, Exch. 400; 5 Barnewell & Cress, 875; 6 Id. 703; *Webb's Case,* Coke, 92; Moore, 474; Gunning on Tolls, 106, 110; *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420; *Ogden* v. *Gibbons,* 4 Johns. 150.)

The grant of any such franchise is the grant of a right to an exclusive toll, consequently the grant of an exclusive privilege, a monopoly.   (See authorities last above cited.)

It is laid down that in grants which abridge public rights, a consideration must in general be shown.   (Hargrave's Law Tracts, "De Jure Maris," 18–36; Angell on Tide Waters, 106, 107.) This very doctrine implies that grants may be made which abridge public rights; and in the case at bar a consideration is shown.

Nor can it make any difference in principle whether public rights over land or over water be abridged.   The power in the one case necessarily implies and includes the power in the other.   In *Carter* v. *Tharcot* (4 Burrows, 2161), Lord Mansfield says, that if the proprietor of land adjoining the sea " can show a right by grant or prescription, which supposes a grant, he may have an exclusive right in the arm of the sea or navigable river."   The same doctrine is also clearly laid down in the following cases: (1 Durnford & East, 669; 4 Id. 439, 668; 1 Modern, 105; 2 Bosanquet & Pull, 472.)   Such, then, is the law of England.

It is the law of New York.   (*People* v. *Platt,* 17 J. R. 195.)

It is the law of Connecticut (1 Conn. 382), where the Court hold that the State may grant an exclusive right of fishing in arms of the sea or navigable rivers.

It is the law of Massachusetts (*Commonwealth* v. *Inhabitants of Charlestown,* 1 Pick. 180); and we may with safety assert that it is the law everywhere.

How can this Court make a distinction between different kinds of franchises?   Whether over land, or over water?   Whether of a ferry, or bridge, or of a telegraph?   The power of the Legislature clearly extends to the one; why does it not to the other?

In England the granting of franchises or exclusive privileges pertained to the Crown in ancient times. In modern times, it seems to be exercised conjointly by the Crown and Parliament. The Legislature, conjointly with the Governor of the State, has the same power in making grants of franchises, etc., which belonged to the Crown and Parliament of Great Britain, save so far as that power is curtailed by the Constitution of the State.   And we have already seen that the Constitution in no wise restricts or controls the Legislature in the granting of franchises or exclusive privileges. Indeed, one of the sections in Sedgwick on Constitutional and Statute Law is headed thus: " Of Statutes creating monopolies, granting franchises and charters of incorporation." (See Sedgwick, 338.) Thus, clearly showing that this learned writer and able lawyer understood it to be within the power of the Legislature, by statute, to grant monopolies or franchises.

The very rule itself, sanctioned by the American authorities, that grants of monopolies, franchises, exclusive privileges, etc., must be liberally construed in favor of the public (See Sedgwick on Con. & Stat. Law, 338, 339; *Providence Bank* v. *Billings*, 4 Pet. 514; *Parker* v. *Sunbury and Erie R. R. Co.*, 19 Penn. 211; *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420), necessarily implies that such grants may be made by the Legislature.

IV.   The Act of May 3d, 1852, created a contract which is protected by the Constitution of the United States, and which no subsequent legislation or judicial decision can annul or impair. (See *Boston and Lowell R. R. Co.* v. *Salem and Lowell R. R. Co.*, 2 Gray, 1, et seq.; *Dartmouth College* v. *Woodword*, 4 .Wheat. 518; *Fletcher* v. *Peck*, 6 Cranch, 135; *West River Bridge* v. *Dix*, 6 How. 507; *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 7 Pick. 507; *New Jersey* v. *Wilson*, 7 Cranch, 164; *Green* v. *Biddle*, 8 Wheat. 92; *Providence Bank* v. *Billings*, 4 Pet. 460; *Gordon* v. *Appeal Tax Court*, 3 How. 133; *Osborne* v. *Bank of U. S.*, 9 Wheat. 738; *Gardner* v. *Newburgh*, 2 John. Ch. 162.)

V.   The plaintiff had capacity and power to purchase, take, and hold, the franchise granted to Allen & Burnham.   The plaintiff was regularly incorporated under the general laws of this State for the

formation of telegraph companies; and being organized and incorporated under that general law was, consequently, in the language of the Constitution (Art. 4, Sec. 31), "formed under that general law," and can in no just sense be said to have been "created by special act."

It follows, then, that at the time when the transfer was made by Allen & Burnham, the plaintiff had a legal existence, and was a regularly incorporated body, having previously been "formed" or "created" in the regular way pointed out by law.

The prohibition of the Constitution extends only to the "formation" or "creation" of corporations; and consequently after such "formation," or "creation," every corporation becomes at once clothed with all the rights, powers, privileges, and attributes of corporations, as known and recognized in law, unless restricted by the Act of Incorporation. But the act under which the plaintiff was incorporated, placed no restrictions upon the plaintiff which would debar it from taking the rights of Allen & Burnham. (See Compiled Laws, 300, *et seq.*) Sec. 148, p. 301, declares the plaintiff to be a body corporate, and thus invests the plaintiff with all the powers and rights of a body corporate, for the purpose of "constructing a line or lines of telegraph through this State," (Sec. 146, Compiled Laws, 300), "or from and to any point within this State." (Id.)

The plaintiff, after being duly "formed," or "created," had the right and power, as a necessary incident to carrying out the purposes of its creation, to acquire such rights from the State itself; and if from the State itself, most clearly from any person or persons to whom the State had legally transferred such right.

The statute (Comp. Laws, 301, Sec. 149) expressly empowers the plaintiff "to purchase, receive, and hold, and convey such real estate" "as may be necessary for the convenient transaction of the business, and for effectually carrying on the operations of such association." Thus the statute, instead of restraining the Common Law powers of the plaintiff, expressly concedes them, and in terms confers upon the plaintiff the powers which it would have possessed without the statute. And corporations, unless restrained by their charters, have an indefinite right of purchase; and so rigidly is

this rule carried out that, where the restraint is impaired by a proviso, as " provided the lands be necessary for manufacturing purposes," it is incumbent on the party objecting to the purchase, to bring the case, by proof, within the proviso. (*Ex Parte Peru Iron Co.*, 7 Cow. 540; *Dockery* v. *Miller*, 9 Humph. Tenn. 731.)

VI.   The defendant has no right to question the validity of the conveyance and transfer to the plaintiff.   If the plaintiff has transcended its powers, that is a matter between itself and the State, and cannot be called in question by a third person ; it is a matter wholly between the directors and stockholders, and between the stockholders and the Government. (*De Ruyter* v. *St. Peters Church*, 3 Comstock, 238; *Arthur* v. *The Com. and R. R. Bank of Vicksburgh*, 9 Smedes & Marsh. 394; *Robins et al.* v. *Embry et al.*, 1 Smedes & Marsh. Ch. 268, 269.)

The plaintiff became organized as a corporation.   It then took the transfer from Allen & Burnham.   The plaintiff then went on and performed the contract of Allen & Burnham; built the telegraph, and paid, and has continued to pay into the treasury of the State the amount stipulated in the Act of May 3d, 1852.   The question as to the validity of the transfer from Allen & Burnham to the plaintiff, can only arise between the State and the plaintiff. And the State, by accepting the payments as stipulated by the Act of May 2d, 1852, is estopped from denying or questioning the legality of the transfer to the plaintiff.   (1 Parsons on Con. 118; *Selma and Tenn. R. R. Co.* v. *Tipton*, 4 Ala. 808; *Dezell* v. *Odell*, 3 Hill, 219, 221; 1 Greenl. Ev., Sec. 207.)

*Crocket, Baldwin,* and *Crittenden,* for Respondents.

The main question in this case is as as to the capacity of the plaintiff, a corporation created under the general law, to take the special and exclusive privilege conferred by the Act of May 3d, 1852, upon Allen & Burnham.

We contend that a corporation created by general act can take only those powers and rights given by the general law ; and that it cannot take any exclusive privileges which are given by special act, either directly to itself, or, in the first instance, to individuals, and then assigned by those individuals to such corporation.   We

California State Telegraph Co. *v.* Alta Telegraph Co.

do not mean to say that a corporation may not take property necessary to the carrying on of its business, for this is given by the general law; but that it cannot, either originally or derivatively, take to itself a franchise or exclusive privilege. For example: We contend that though it might be in the power of the Legislature to grant a ferry franchise to A, which, by the terms of the act, is exclusive in its nature, yet that it could not grant such exclusive privilege to a corporation formed for running a ferry. This brings us to consider the meaning of those clauses of the Constitution in regard to corporations.

The Constitution seems to be jealous of corporations. It feared the influence of accumulated capital when associated with any special privileges. It adopted the democratic idea that monopolies of all sort were odious, and that exclusive privileges in the hands of corporations gave them unfair advantages over individuals. Hence, while the Constitution allowed to corporations the benefit of organization and of associated capital, it also sought to prevent the evil of creating a monopoly, or increasing their powers by the aid of any special or exclusive privileges. It intended to create, as far as practicable, equal right in all the people of the State to participate, if they chose, in the advantages to be derived from their voluntary association as corporators; giving to no one, over others, governmental or political patronage or favor. Those franchises which belong to Government, and which individuals cannot get except by grant from the political power—which are a part of the sovereignty—it withholds from corporations, or, if it does not withhold them, can only give them by some general law, which applies, of course, to all alike. If the exclusive privilege owes its existence necessarially to a special act, such a special act can no more inure to the benefit of the corporation created under the general law, than could the corporation be created out and out by special act; for we see no difference between the corporation created in part, or having its functions, powers, or faculties given in part by special act, and its being indebted for its whole existence to special act.

The constitution declares that " corporations shall not be created by special act; but may be created by general law." Now what is the meaning of this clause? Was it merely intended to prescribe

California State Telegraph Co. v. Alta Telegraph Co.

a mode by which acts of incorporation were to be passed—a mere regulation of the forms of legislation ? We think not. The very gist of the inhibition and direction was a restriction upon the powers and rights of corporations. The provision as to their creation by general law was designed to insure equality and uniformity in the powers of these bodies. It was supposed that the general law was to serve as a general charter of these corporations; to prescribe the extent of their powers; to comprehend all corporations of like kind, giving all the same powers and rights. There was to be no partiality and no distinction between them. All were to owe their existence to the same instrument, enjoy the same rights, and to be subject to the same restrictions and responsibilities.

According to the argument of the other side, if the corporation be once formed under the general law, it can be the recipient of any privilege, power, or faculty, by special act. A railroad corporation could have imparted to it, by special act, the exclusive privilege of carrying passengers and freight by land between any two points, or possibly throughout the State. A telegraph line, as in this case, could have granted to it, in effect, the telegraph business between the great points in the State claimed for it. And what would have been gained by the clause of the Constitution ? The Legislature would only have to pass a general law, like that on the statute book; and then having got the corporation formed under the general act, make, by special act, the favored corporation the depository of all the special powers or exclusive privileges which are given in other States where no such clause exists. The powers of corporations would not be affected at all by our Constitution, but only the mode of giving them. The general act might contain nothing except the bare skeleton of a corporation, while the special act, coming directly after, might clothe and arm the corporation, which was thus provided for, with all manner of extraordinary powers and exclusive privileges. Monopoly after monopoly might be engrafted upon the corporation established under the general law. We can see no difference between creating a corporation by special act, and giving it exclusive privileges by special act; nor is there any difference, in this respect, between granting directly to it special privileges—giving, as in this case, a monopoly

27

—and giving to a private person this monopoly, and allowing that person to assign the monopoly to the corporation. In either case it would be a mere evasion of the constitutional inhibition—a direct contravention of the policy of the Constitution in this important matter.

Constitutions being necessarily general in their terms, are to be construed, not, as penal laws, with strictness, but liberally, in advancement of the obvious policy which they establish or intimate. The clause in question was evidently designed—as not only the "Debates," but its own terms and context show—as something more than a direction to the Legislature as to the process of passing acts. The Convention supposed that when the Legislature were denied any other mode of creating corporations than by a general law, it would of necessity result, that special privileges could not be conferred upon any one or more of them; that the general law would stand in the place of their charter, it applying to all alike; that the effect would be to deny to any, whatever was not granted to all. Looking to the clause, therefore, in connection with the well-known facts which existed at the time, and to the political questions which gave rise to the provision, it seems to us clear that the policy which the Constitution meant to establish was, to divest incorporations of the capacity to hold any exclusive privilege whatever which was the subject only of special legislative grant; that where a particular privilege could only be conferred by special act, then no one corporation could take it, either immediately from the Legislature or mediately. We do not say that the Legislature could not, by the general law (or possibly otherwise), provide that every corporation of a kind like this should have a right of way over the State's land, etc., exclusive right, etc. (but this provision, to be constitutional, would have to comprehend all corporations of the same class); but we contend that the Legislature could not, by special act, give a particular corporation this right, any more than it could entirely create a corporation by special act. The learned counsel say that this exclusive privilege is property, and that the Telegraph Company has the right to hold property of this kind—it being necessary for the convenient transaction of its business, etc.

California State Telegraph Co. *v.* Alta Telegraph Co.

We dispute that this exclusive privilege, however profitable, is necessary, within the sense of the law, to the transaction of its business.   So in the same sense would be an exclusive privilege to do all the telegraphic business of the State.   Our answer is, that whether this privilege be property or not, it is, at the same time, a special exclusive right to monopolize a particular species of trade between the important commercial points of the State ; a right given by special act of the Legislature, and therefore creating this a special corporation, for all practical purposes, when the Constitution meant, by requiring corporations to be created under general law, to make it of like kind and character with other corporations of the same class.   The exclusive privilege is the main thing—the corporate character comparatively nothing.   The specialty is every-thing—the general corporation nothing.   The very evil the Constitution meant to guard against is illustrated vividly in this case. For here we have a corporation, with the benefits of associated capital and the convenience of the corporate character, holding a monopoly for years of the business in an important branch of trade, which, in its effect, is nearly equivalent to the entire control of the telegraphic business of the whole State.   And it claims all this, directly or indirectly, through legislative acts.   Now what more could this corporation do or have, if there was no clause in the Constitution restrictive of corporations ?   In what respect, if this be legal, is a corporation any more restricted in its powers in California than elsewhere ?  it is true that the corporation cannot be created or formed by or through a special law ; but this is so much the better for it—special privileges and powers can be afterwards given by special act ; or if not given directly to the corporation, it would always be easy to find some convenient *locum tenens ;* or, if not in this way, to buy up such franchises as might be acceptable. In this way the operations of the corporation would be more insidi-ous, easy, and unsuspected.

The case of *Lowe* v. *Marysville* (5 Cal. 216) establishes, we think, the principle for which we contend.   Marysville was a municipal corporation, and the mayor subscribed for stock in a steam navigation company under authority of an ordinance.   The validity of this subscription—being for an object not within the municipality

California State Telegraph Co. *v.* Alta Telegraph Co.

—was brought in question.   Two points were made : first, on the construction of the second section under which the right was claimed—the appellant contending that the section did not authorize the subscription ; second, that if it did, the act was unconstitutional.   The ground of unconstitutionality was, that the enterprise was not one of those municipal or police objects which a municipal corporation, under the constitution, was authorized to act upon. The authority, therefore, was special, and the Court decided both points.   The Chief Justice said : " If we are right in assuming that the powers of municipal corporations must be confined strictly to police or governmental purposes, and that the term was employed in this sense in the Constitution of the State (as appears from the Constitutional Debates as well as the general acceptation of the words), then it follows that the power thus given by the second section could not be conferred by special act ; for it would have been in violation of the Constitution to create an incorporation by special act for other than municipal purposes, it follows that it would be equally unconstitutional to confer special power on a corporation already created.   In other words, it would be doing by two acts that which the Legislature could not do by one ; and corporations for almost every purpose might be created by special act by first incorporating the stockholders as a municipal body."   So here, there would be by the assignment of the benefit of a legislative act granting a special power of right, a conferring of a special power (or privilege) to a corporation already created ; it would be doing by two acts what could not be done by one ; for if a law were passed directly creating this corporation with this privilege, it would be unconstitutional ; and the result would be that a corporation might in effect be created by special act, since by a mere organization under the general law, it might become the recipient of faculties, rights, powers, and privileges, which were conferred, and could only be conferred by special act—the whole character of the corporation so entirely changed by the special privileges of which it was the assignee, that the effect would be in every material respect the same as if the whole corporation were created by special act.   The uniformity and equality which the general law was designed to give to all corporations of the same

class would be broken down, the general likeness destroyed, and every mark and characteristic of a peculiar and specially-created artificial being impressed on the favored body.

It is evident that the late Chief Justice attached the most liberal meaning to the term " create," when applied to corporations ; that this word stood, in his estimation, for more than the mere birth or first shape of the body ; and comprehended a forming of all the elements, parts, and faculties of this entity.  It is apparent that no part of the framework of the corporation, or of its powers, rights, or privileges, could be given, in his opinion, by special act.  That when the Constitution prescribed that the corporation should only be created by general law, merely the powers, rights, and privileges which are given to them by that general law should attach to them.

We regard the questions involved in this case as of the utmost public importance.  They go far to settle the entire constitutional law of corporations in this State.  The consequence of the decision in favor of the appellant, will be unquestionably, as a practical thing, to give to every corporation in this State all the powers possessed, or which could be conferred by the laws of any State in the Union or England.  Though exclusive privileges may constitutionally be conferred by the Legislature on individuals, the power is of little danger, because to render it dangerous or to create a monopoly, it is necessary, in the condition of the country, that many should associate together—the capital of one or a few being insufficient for " grand enterprises."  But if it be conceded that all that is necessary to secure this concentration of capital, is to grant exclusive privileges or franchises to one man or a few, who may then assign them to a corporation, the work is at once accomplished ; and the Legislature may be got to confer enormous privileges on a few favorites.  A corporation may be formed to make a wagon road over the mountain passes or through the State ; and a special act giving to A B C the exclusive right of transporting goods will be ready awaiting the formation of the corporation under the general law, to receive the privilege.

An exclusive privilege of fishing on the sea-shore may be lodged in D to await only the forming of a corporation by his copartners

to receive the privilege. Ferriage over the Bay of San Francisco may be suffered by special act to be carried on exclusively by E, and E straightway, of course, conveys the franchise to a corporation, preordained to be established to get the privilege. And so of every thing else which may be the subject of legislative favor, however that favor may chance to be conciliated.

Every one knows that it is much easier to procure a grant in favor of a private person than of a corporation; and, therefore, if the doctrine advanced be true, the restriction in the Constitution will amount practically, to an enlargement of the powers of corporators.

This case is a good illustration: "Lines shall not be constructed, or offices established so as to do business between the cities aforesaid." In other words, Allen & Burnham shall have the sole privilege of doing the telegraphic business between the leading commercial points of the State for fifteen years; a clear and enormous monopoly—an exclusive privilege—purely statutory; and this transferred soon after to the appellant. Then no one is allowed to construct a line within half a mile of the line (in its whole course) selected by Allen & Burnham.

We doubt, independently of the grounds just taken, whether the Legislature has any right to grant this wholesale monopoly. It seems to us to be against common right. We shall not dispute the right to grant a franchise of ferries, bridges, roads, etc.; but would it be tolerated at this day that the Legislature should grant all ferries in a county—all bridges on or over a long river—all roads in the county or State, to A, B, or C? Suppose the Legislature should grant a right of transporting all freight between two leading points in the State to A would the grant not be void as in restraint of trade or against common right? And what is the difference in principle between granting a right to convey all messages by telegraph; between doing all the wagoning and all the telegraphing? Or suppose there was no national postal system; but the conveyance of letters was open like other business to competition, would a law which gave all the carriage of letters between San Francisco and Sacramento to A as his exclusive privilege, be constitutional? Is such a privilege as this a franchise grantable

by the sovereign; or is it not a mere monopoly, void when granted as against the general right of the people and the whole spirit of the Constitution?   Moreover what power had the Legislature to grant the right to use the streets of San Francisco, Sacramento, etc.?   Those streets do not belong to the State, they are not highways of the State; but mere easements, the fee of the land being either in the city as proprietor, or in the individuals holding the soil; the use of which streets the owner may have dedicated to the public as such—the Plaza—for example.   The State might by virtue of its sovereignty, exercise some public control over such streets, to make or keep them subservient to the uses for which they were dedicated; but we deny that it could pervert them to other and foreign uses for the benefit of private citizens, or their enterprises.   It might also take it by right of eminent domain, but only by and after making compensation.

We apprehend it could not give an exclusive privilege to A to run his telegraph line over B's land, or establish his stations there; or if it did attempt it, that C could grant to D the right to run his lines over his (C's) own lands, and that D would not be affected by any such unauthorized exercise of authority in favor of A.   In answer to the argument that whether the appellant could take this privilege or not, the respondent could not object, we respectfully suggest that this argument, if it could apply in any case, could not in this.   This is a case of title, and of title under statute, and the rule is well settled, that whenever a statutory right is claimed, the title must be clear before the Court will interfere by injunction.

*Geo. R. Moore,* also, for Respondents.

I.   The Act of May 3d, 1852, is in direct conflict with Sec. 31 of Art. 4 of the Constitution.   This section provides that corporations may be formed under general law, but shall not be created by special act except for municipal purposes; and Sec. 33 of the same act says: " The term corporation, as used in this article, shall be construed to include all associations and joint stock companies having any of the powers and privileges of corporations not possessed by individuals or partnerships."   Allen & Burnham were a corpora-

California State Telegraph Co. *v.* Alta Telegraph Co.

tion within the meaning of this section. They were associated together for the purpose of constructing a telegraphic line and carrying on the business of telegraphing between the points named, and possessed powers and privileges which individuals and partnerships did not and could not possess. Before the passage of this Act of May 3d, Allen & Burnham did not possess the power and privileges of constructing a telegraph line between the points named or the right of way along the route. They did not possess the franchise which the act conferred. All these powers and privileges were acquired by the act. The Constitution itself fixes the necessary elements of a corporation, and we are not permitted to go to the common law or elsewhere for a definition. If an association or joint stock company possesses any of the powers and privileges of corporations not possessed by individuals or copartnerships, it is a corporation within the meaning of this article. Now as we have shown, Allen & Burnham did not possess powers and privileges such as corporations alone enjoy and which were denied to individuals. Besides, Allen & Burnham had all the necessary prerequisites to constitute them a corporation at common law : 1st, the name by which they received the grant was a corporate name to all intents and purposes ; but if not, then a corporate name could have been assumed by implication. This is well settled. (1 Black. Com. 474, 475 ; 1 Kyd on Cor. 234–253 ; 2 Kent's Com. 292.)

The act provides for succession. The grant is made to Allen & Burnham, and their assigns and their successors. They have the power to acquire, hold, and grant all the property real and personal that may be necessary to carry into operation the object of their organization. They have the power to contract obligations and to sue and to be sued in the corporate name which they already possessed, or which they had a right to assume. These, says Mr. Kyd in his work on Corporations (vol. 1, pp. 13, 69, 70), are the essence of corporation.

Mr. Blackstone says, that the first five incidents mentioned in the text are inseparably incident to every corporation, aggregate, (1 Black. Com. 475)—that is, they exist as a matter of cause without being specified in the grant. " The general rule is that every corporation has a capacity to take and grant property and to contract

obligations; but these general powers, incident at common law, are restricted by the nature and object of the institution, and in pursuance thereof it may make all contracts necessary and useful in the course of the business it transacts as means to enable it to effect such object, unless prohibited by law or its charter, and to attain its legitimate objects it may deal precisely as an individual who seeks to accomplish the same end." (*Barry* v. *Merchants' Exchange Co.*, 1 Sanf. Ch. 280; 9 Paige, 470; 2 Hill, N. Y. 265.)

We say then, that if the Act of May 3d had force and validity enough to accomplish anything, it constituted and created Allen & Burnham a corporation within the meaning of the Constitution and also by the rules of the common law.

II.    But suppose the act were valid in the hands of Allen & Burnham on the ground that they were not a corporation, it became absolutely void when the franchise created by it was assigned to and possessed by a corporation organized and existing under the general corporation law.    If an arrangement of this kind could be sustained by the Courts the Legislature might create every species of monopoly in the face of the Constitution.    Let us examine the *modus operandi*.    A number of persons organize for some purpose under the general law.    Two or three of the corporation as individuals apply to the Legislature for exclusive powers and privileges which, when granted, are immediately assigned to the company, and thus the Legislature do by two acts what they could not constitutionally do by one.    The Constitution forbids the creation of a corporation by special act, but if the appellant be correct a corporation already in existence under the general law may take and hold by assignment as many special and exclusive privileges and the benefits of as many special acts as may be desired.    The Constitution, the Courts, justice, and common sense proclaim a different rule.    The sacred magna charter of our country is not thus to be disregarded and trampled upon.    The equal rights and privileges secured to all are not to be thus trifled with.    This is not a new question; it has been directly passed upon by this Court in *Low* v. *City of Marysville* (5 Cal. 216), where our position is fully sustained.

The great object of the framers of our Constitution was to restrict legislation to such limits that no monopoly could ever exist

in this State in any branch of industry or business. If it were necessary for us to go outside of the Constitution itself to ascertain its meaning, the debate in the Convention upon this point would afford us all the light required, and furnish us a guide for correct interpretation. But the language employed is so plain and comprehensive that extraneous research is wholly unnecessary. If such extraordinary partiality as the act in question exhibits were to be tolerated, in spite of the constitutional inhibition, the fearful evils which have been the bane of other States would be fastened upon us, and the boasted equality which we had believed to be ours forever would in a moment be swept away. Privileged monopolies would grow up to oppress the many, while the favored few would become opulent in the enjoyment of unjust and partial legislative grants.

III. Plaintiff had not the power to take an assignment of Allen & Burnham's franchise. At the time of this assignment or purchase, plaintiff was a corporation organized and existing under the general corporation law, and could exercise no power not conferred by that act. Under this incorporation act plaintiff was authorized to purchase and hold any real and personal property that might be necessary to carry into effect the objects of the organization. Now what did plaintiff purchase and obtain from Allen & Burnham? It was certainly neither real nor personal property, and consequently not within the specified character of property which plaintiff was permitted to purchase. In the case of *De Witt* v. *Hays* (2 Cal. 463) this Court said: "The right of the plaintiff in the premises is simply the right to collect wharfage and dockage for a certain term of years, and is neither real nor personal property, but a franchise, or incorporal hereditament—an uncertain profit arising out of the realty." The right granted to Allen & Burnham, so far as its character as property is concerned, is similar to a ferry privilege.

"A ferry is a franchise and is not the subject of levy, sale, or delivery." (*Warren* v. *Thomas*, 5 Cal.) Now has the plaintiff the right to purchase a franchise which we have shown is neither real or personal property, and that too when it was not necessary to carry out the objects of its organization; in other words, without any express or implied authority could the plaintiff purchase, hold,

and exercise the powers, rights, and privileges of another distinct and separate corporation ?

"A corporation cannot contract unless the charter of incorporation enables it to contract, and in that case it is restricted to the mode and subject matter prescribed." (*N. Y. Insurance Co.* v. *Ely Parsons,* 5 Con. 660.) A corporation has no power except what is given by its incorporating act, either expressly or as incidental to its existence. (*Head* v. *Providence Insurance Co.,* 2 Cranch, 127 ; *Dartmouth College* v. *Woodward,* 4 Wheat. 636 ; *Beaty* v. *Knowler,* 4 Pet. 152 ; *Smith* v. *Morse,* 2 Cal. 524 ; *Lowe* v. *The City of Marysville,* 5 Id. 216.)

Then if, as we have seen, plaintiff had no power under its incorporation act to purchase a franchise, the assignment from Allen & Burnham was invalid and of no binding effect as against respondents.

*Geo. Cadwallader,* for Northern Telegraph Co. Respondent, in addition to the points urged by his associates, argued :

I.   The plaintiff derives its existence from the general Incorporation Act of April 22d, 1850, which required of the persons proposing to form a corporation to designate the points to be connected and the general route of the telegraph line between such points.

The one hundred and fiftieth section of this act is in the nature of a direct grant of the right of way for such corporations between the points indicated in their certificate, and the one hundred and fifty-second section affords to such corporations protection from trespassers, etc.   This act (not repealed) permitted as a matter of course the creation of a corporation to do business between San Francisco and Marysville, and endowed such corporation with the privileges conferred by the act, and above all other things the right to do business between those points.   The general law was passed April 22d, 1850, and the Allen & Burnham grant on the third of May, 1852.   The first declared it lawful for corporations organized under its authority to construct and operate lines of telegraph between San Francisco and Marysville.   The latter declared that no persons but Allen & Burnham should have that right, and section second of the last act says : " That no existing law shall be so construed as to conflict or interfere with the provisions of this act."

Now consider the Allen & Burnham grant constitutional and it must follow that the law of May 3d, 1852, repealed so much of that of April 22d, 1850, as permitted the organization and operation of telegraph companies to do business between San Francisco and Marysville by the way of San José, Stockton, and Sacramento; and that the plaintiff on the first day of June, 1853 (the time stated in its complaint), could not become a corporation to do business between those points under the general law of April 22d, 1850, because so much of the law as permitted the incorporation of telegraph companies between those points had been repealed by the Allen & Burnham grant of May 3d, 1852, and not being a corporation could not buy the Allen & Burnham grant nor maintain this suit.

II.   The construction and operation of a telegraph between San Francisco and Sacramento by the respondent was a lawful business, and the Legislature was without the power to confer upon Allen & Burnham the exclusive right to do such business between those points.

*The Norwich Gas Light Co.* v. *The Norwich City Gas Co.* (25 Conn. 19) is directly in point. In this case the Court observes, against an exclusive gas grant, that " the manufacturing of gas for the purpose of lighting buildings is a lawful business." As we say in this case, the right to communicate by telegraph between different points in this State is a natural right that cannot be disposed of by the Legislature.

CROCKER, J. delivered the opinion of the Court—COPE, C. J. concurring specially.

This is an appeal from an order dissolving a temporary injunction, which was granted and dissolved upon the complaint alone. The complaint alleges that on the first day of June, 1853, the plaintiff was duly incorporated under the general Corporation Law of this State, passed April 22d, 1850, for the purpose of constructing and operating an electro-magnetic telegraph line from the City of San Francisco to the City of Marysville, by the way of San José, Stockton, and Sacramento ; that immediately thereafter Allen & Burnham assigned to them all the rights and privileges

granted to them by the Act of May 3d, 1852 (Statutes of 1852, 169); that they afterwards constructed and put in operation the said line of telegraph at an expense of $250,000, and have in all respects complied with the conditions of said act; that the said Alta California Telegraph Company is a corporation formed under the Act of 1850, and has, in concert with the other defendants, constructed a telegraph line between San Francisco, San José, and Sacramento, have established offices in said cities, and are transacting a telegraph business thereon: that defendant's line runs in a large part of its course within less than half a mile of plaintiff's line; that they have suffered great injury thereby—in the sum of two hundred and fifty dollars; that the defendants intend to continue the business; that it is utterly impossible for the plaintiff to ascertain and prove the amount of business done by the defendants, and the injury would therefore be irreparable, and prays for a perpetual injunction against the defendants, restraining them from doing any telegraph business between said cities.

The case presents the following questions for our adjudication: 1st, is the Act of May 3d, 1852, granting certain exclusive privileges to Allen & Burnham, constitutional; 2d, have the plaintiffs the power or right to purchase, hold, and enjoy these exclusive privileges? The determination of these matters involves some important constitutional questions which have received very little judicial consideration, and we must therefore mainly rely upon those general rules of constitutional construction which are applicable to questions of this character. One rule is that it is competent for the Legislature to exercise all legislative powers not forbidden by the Constitution, or delegated to the National Government, or prohibited by the Constitution of the United States; and that an Act of the Legislature is to be held as void only when its repugnance to the State or National Constitution is clear beyond a reasonable doubt. (*Cohen* v. *Wright*, 22 Cal. 295, and cases there cited.)

1. The first point is, whether the Act of May 3d, 1852, is repugnant to the Constitution. The first section of that act grants to Allen & Burnham, or their assigns, the right and privilege to construct and operate a telegraph line from San Francisco to Marysville by the way of San José, Stockton, and Sacramento, with the

right of way over any lands belonging to the State, and on any streets, roads, or highways, and across any stream, for the term of fifteen years, prohibiting all persons from locating or constructing any telegraph line within half a mile of the line constructed by them, except in or near a city. It provides that local side lines may be constructed, " *but lines shall not be constructed, nor offices established, so as to do business directly or indirectly between the cities aforesaid.*" It also contains certain conditions imposed upon the grantees. Sec. 2 provides that " no existing law shall be so construed as to conflict or interfere with the provisions of this act, provided that the owners of this line shall at all times conform to the present law of the State concerning telegraph companies, so far as it relates to the transmission of messages." The other sections it is unnecessary to refer to.

This act confers certain special privileges, in the nature of a franchise, upon Allen & Burnham. Franchises are privileges derived from the Government, vested either in individuals or private or public corporations, and are of various kinds, such as the privilege of exercising the powers of a corporation, of having waifs, wrecks, estrays; the right to collect tolls on a road, bridge, ferry, or wharf;. the privilege of fishing, or taking game, and numerous others which might be referred to. In England a large class of franchises exist which are unknown to our law, but some are of more extensive use here than there, especially corporate franchises.

The grant of a franchise is in the nature of a vested right of property; subject, however, in most cases, to the performance of conditions and duties on the part of the grantees. They generally involve important duties of a public character, often onerous upon the grantees. They are necessarily exclusive in their character, otherwise their value would be liable to be destroyed, or seriously impaired. So long as the grantee fulfills the conditions and performs the duties imposed upon him by the terms of the grant, he has a vested right which cannot be taken away, or otherwise impaired by the Government, any more than other property. And even though the grant does not declare the privilege to be exclusive, yet that is necessarily implied from its nature. In the grant of a bridge, ferry, turnpike, or railroad, it is implied that the Govern-

ment will not, either directly or indirectly, interfere with it so as to destroy or injure it.    Franchises are derived entirely under grants from the Legislature, either by general or special laws.    There is a large class of special privileges conferred upon public bodies, or private individuals, for numerous purposes relating to the public interest, which are franchises.    The most common known to American law are those of corporate and banking privileges; and they have multiplied beyond all precedent under the system of general incorporation laws, by which these privileges, instead of being conferred upon a few, are open to all.    The nature and character of franchises have been most clearly defined in 3 Kent's Com. 599, etc.

The law of this State regulating ferries and toll-bridges gives the owners an exclusive privilege by prohibiting the establishment of any other ferry or bridge within one mile.    (Wood's Dig. 460.) And this Court has always protected the parties in the enjoyment of these exclusive privileges.    (*Hanson* v. *Webb*, 3 Cal. 237; *Norris* v. *Farmers and Teamsters' Co.*, 6 Id. 594; *Chard* v. *Stone*, 7 Id. 117.)    In many cases, however, the law conferring franchises, such as turnpike roads, does not confer any exclusive privileges, and they are then open to competition.    (*Indian Cañon Road Co.* v. *Robinson*, 13 Id. 519.)    This question, whether the privilege shall be exclusive or not, depends entirely upon the wise discretion of the Legislature.    The granting of franchises, whether exclusive in their character or not, is one of the ordinary powers of legislation, and as such can be exercised by the Legislature of this State; controlled, however, by the restrictions imposed on it by the Constitution.

The next subject of inquiry is, what constitutional limitations have been imposed upon this general power.    One is that " corporations may be formed under general laws, but shall not be created by special act except for municipal purposes.    All general laws and special acts passed pursuant to this section may be altered from time to time or repealed."    (Const. of Cal. Art. 4 Sec. 31.) There are other provisions defining the meaning of the term " corporations," regulating the liabilities of their members, prohibiting and requiring the Legislature to prohibit by law, all persons or corporations from exercising the privileges of banking, or creating

paper to circulate as money.  Here are plain and explicit limitations upon the powers of the Legislature, by which they are positively prohibited from conferring the special privilege of banking or issuing paper money upon any person or corporation, and from creating a body with corporate privileges by special law except for municipal purposes.  The object and design of these limitations are evident to all.  The evils flowing from the issue of paper money by banks are too well known to need comment.  The limitation upon the creation of private corporations by special laws closed a prolific source of legislative corruption.  In other States, where no such restraint exists, corporate privileges can only be secured by special grant from the Legislature at great expense and delay.  No good reason existed why the right should not be enjoyed by all who desired, and the framers of our Constitution wisely removed the difficulty by requiring that these privileges should only be obtained under general laws, open to all citizens upon equal terms.

These are all the constitutional limitations upon the power to grant franchises, and it is clear they do not prohibit the granting of the privileges vested by this act.  From the fact that no other limitations are imposed, it is evident that it was the intention to leave the Legislature free to exercise its discretion in all other cases.  It is contended, however, by the respondents, that the clause prohibiting the creation of private corporations by special law does in some way render this law unconstitutional, but we cannot see any force in their argument on this point.  It is certain that the act does not in any sense make Allen & Burnham a corporation.  The special privileges which it confers upon them are entirely distinct from those powers which are the distinguishing features of a corporation.  That privileges of a like character are sometimes conferred upon corporations does not make these individuals a corporation.

Much is said about the odious character of monopolies, in which we entirely agree, but such arguments should properly be addressed to the Legislature, with whom the power is vested.  We cannot deny the existence of the power to grant special privileges without overturning the legislation of centuries and the whole system of jurisprudence upon the subject of franchises and vested rights of

property. We therefore hold the act in question to be constitutional.

2. The next, and most important question is whether the plaintiff, a corporation, had the power to purchase and hold the special privileges granted by the act to Allen & Burnham. It is not disputed that those grantees had power to sell and convey, for the act specially makes the grant to them, or "their assigns," thus clearly making the privileges assignable. But it is urged that the clause in the Constitution which prohibits the Legislature from creating a private corporation by special act, equally prohibits them from conferring any powers or privileges of a corporate character by special law; and that all the powers and privileges which a corporation can exercise or hold must be derived from a general law, applicable alike to all corporations.

It is clear that the Constitution prohibits the Legislature from "creating" corporations by special act, except for municipal purposes; and it is equally clear, that this prohibition extends only to their "creation." There is nothing in the language used which either directly or impliedly prohibits the Legislature from directly granting to a corporation, already in existence and created under the general laws, special privileges in the nature of a franchise, by a special act, or prohibiting a corporation from purchasing or holding such franchises, which may have been granted to others. To give the Constitution any such effect, we would be compelled to interpolate terms not used, and which cannot be implied without a perversion of the language employed. To give it such a construction, we would have to make it read thus: "Corporations may be formed, *and other franchises and special privileges granted,* under general laws, but shall not be created *or granted* by special act, except for municipal purposes." If such had been the meaning intended by the framers of the Constitution, they could have easily expressed it in apt words. The language used by them is clear, and they well knew that it included but one of a numerous class of franchises, the subjects of legislative grant, and that a regulation of one could not by any reasonable implication be extended to others not mentioned.

As we have already shown, a franchise is in the nature of prop-

28

erty; it is a vested right, a subject of purchase and enjoyment by all who are capable of purchasing, holding, or enjoying property, by individuals, partnerships, joint stock associations, and also by corporations, when it is of such a character as to be reasonably included in or useful in carrying out the objects and purposes for which the corporation was created. By acquiring such additional franchises, or special privileges, the corporation is not in any sense "formed," or "created," for they are not of the essence of the corporation; nor can it be properly said that it is thereby adding to its "corporate powers;" but even if such was the effect, as it is only adding to the powers of a corporation already created, and not "creating" one, it cannot be said to be prohibited by the Constitution. Any other construction would be most pernicious in its results. It might be of great importance to the public interest to have a road constructed over some difficult mountain pass, and a corporation organized for that purpose under the general law might be unable to procure the means to construct it in view of the great expense, uncertainty, and hazard attending it, without protection for a limited period against competition, and we see no constitutional prohibition against a grant of such exclusive privilege to such a corporation. So a railroad company might be desirous of purchasing and using a valuable invention, relating to the construction or running of their road, but the holder of the patent might be unwilling to sell the right for any part less than a whole State. Clearly the corporation would have the right to make such purchase and hold it for their own exclusive use, or sell to other roads if they saw proper. We use these merely for illustration, but hundreds of others might be suggested where the propriety and necessity would be apparent to all. This power to grant exclusive privileges ought to be exercised with great prudence and sound discretion, and any Legislature abusing it should be held to a strict accountability by the people. The public, however, suffer no greater injury when such grants are made to corporations than when made to individuals. It is no more a monopoly in one case than in the other.

The plaintiffs were incorporated under the "Act concerning Corporations," passed April 22d, 1850 (Statutes of 1850, 347), the first chapter of which contains general provisions applicable to all

corporations; and the sixth chapter relates to the formation of telegraph companies. Sec. 1 of Chap. 1 provides, that " every corporation, as such, has power: \* \* \* 4. To hold, purchase, and convey such real and personal estate as the purposes of the corporation shall require, not exceeding the amount limited by law." Secs. 20–28, inclusive, authorize and regulate the sale on execution of the franchises of certain classes of corporations, with all their rights and privileges. Chap. 6 confers certain special powers and privileges upon telegraph companies formed under it, such as the right to construct lines of telegraph along the public roads, and across waters, and the right to use private property upon payment of a compensation therefor. As a general rule, a corporation has power to make all such contracts as are necessary and usual in the course of its business, as means to enable it to attain the object for which it was created. The creation of a corporation for a specified purpose implies a power to use the necessary and usual means to effect that purpose. (Angell & Ames on Corporations, Sec. 271; *Union Water Co.* v. *Murphy's Flat Fluming Co.*, decided at the present term.) I hold, then, that the plaintiffs, as a corporation, were capable of receiving a grant of these special privileges directly from the Legislature, and of purchasing them from the grantees.

It is urged, however, that the provision in the Act of May 3d, 1852, that " no existing law shall be so construed as to conflict or interfere with the provisions of this act," operates as a repeal of the general Corporation Law, so far as that law permits the formation of telegraph companies to construct lines between the cities named in the Act of 1852, and, therefore, the plaintiffs, being organized to construct such a line, are not a corporation, and have no power to purchase or hold the privileges granted to Allen & Burnham. This clause has more the effect of a rule of construction than of a repeal of any existing law. The evident meaning is, that the privileges of the right of way, etc., granted to telegraph companies formed under the general law, shall not conflict or interfere with the special privileges granted by the act. There is nothing in it prohibiting or taking away the right of forming corporations to build lines between those cities; but if formed, they must take

subject to the prior exclusive privileges of the grantees, who might waive their rights, or abandon or forfeit them, or transfer the whole or a part to such corporations. To give it the effect claimed, would require a more clear and explicit expression of legislative intention than is contained in this clause.

The Constitution of Indiana ordains that " Corporations, other than banking, shall not be created by special act, but may be formed under general laws ;" and it was held that " the Constitution of the State authorizes the Legislature to create corporations, and imposes no limit as to the powers to be conferred on them; no clause confining their action to objects entirely disconnected with anything outside the corporate limits." (*Aurora* v. *West*, 9 Ind. 85.) The Legislature may give additional powers, from time to time, to corporations; and acts of the corporation, in pursuance of such authority, are binding. (*Gifford* v. *New Jersey Railroad Company*, 2 Stockton's Ch. 171.) And special powers and privileges may be conferred upon existing corporations. The words " create a charter," used in the Constitution, mean to make a charter which never existed before. (*C. P. and A. Railroad Co.* v. *Erie*, 37 Penn. State, 380.) Under a similar clause in the Constitution of New York, relating to banks, it was held that an act declaring that a certain bank should be deemed to be a valid corporation and to have been duly organized, notwithstanding any error, irregularity, or insufficiency in the proceedings organizing it under the general law, did not *create* a corporation, but only remedied defects in the organization of one already created, and it was therefore constitutional. (*Syracuse City Bank* v. *Davis*, 16 Barb. S. C. 188.)

The Constitutions of Michigan, Iowa, Indiana, and Ohio contain similar limitations upon the mode of creating corporations, and the statutes of those States, as well as our own, afford numerous instances of the grant by special acts of particular rights, powers, and privileges to corporations formed under general laws, and the able counsel for the respondent has not cited a single case where the power has been denied by the Courts, except a loose remark made by Chief Justice Murray in the case of *Low* v. *Marysville* (5 Cal. 214), upon a point not then before the Court. That

California State Telegraph Co. *v.* Alta Telegraph Co.

remark, as applicable to municipal corporations, which was the case before the Court, might perhaps have been appropriate, but as applied to other corporations is not entitled to any weight. A uniform series of statutes of this character, extending through many years, is a practical exposition of the Constitution, which is entitled to great weight, especially as it has been so long concurred in, and vested rights of great value and importance depend upon them. We do not refer to these facts as affording a rule of construction applicable to this case, for it is only in cases of doubt and ambiguity that such considerations can be resorted to, to determine the proper construction of the Constitution. In this case we deem it clear that the constitutional prohibition can only be applied to special acts *creating* a corporation, and not to those which merely confer special rights, powers, and privileges upon a corporation already created and in existence under a general law.

The exclusive privilege granted by this Act of 1852 have evidently been a burden upon the people of this State, and it is not strange, therefore, that this claim of the plaintiffs has been most zealously contested. It shows the importance of imposing, if practicable, some judicious restraint upon legislative discretion in such matters. It will be found, however, very difficult, if not impossible, to frame a provision which, while securing the people against an abuse of the power, will at the same time leave the Legislature free to exercise it in that large class of cases where the public interests absolutely require laws of that character. An enlightened public opionion, guided by a free and fearless press, is the only and perhaps the best safeguard against abuses of this kind. The order dissolving the injunction is reversed.

Cope, C. J.—I agree with Mr. Justice Crocker in the conclusion at which he has arrived in this case, and generally with the views expressed by him in his opinion. As to the power of the Legislature to grant the franchise in question I have no doubt; and as to the capacity of the corporation to purchase, the defendant is not the party to object. If the corporation, in making the purchase, has acquired property which, under the law of its incorporation, it had no right to acquire, all that can be said is that it has

exceeded its powers, and may be deprived of the property by a judgment of forfeiture. The question is one which the State alone can raise. A purchase by a corporation in the face of a positive prohibition would be void; but that is not this case. There was no provision of law forbidding the purchase; and admitting that the corporation had no power to make it, the want of power, in the absence of an express prohibition, is not sufficient to avoid it as to third persons. The rule in such cases was laid down by this Court in *Natoma Water and Mining Co.* v. *Clarkin* (14 Cal. 544). In that case the corporation was empowered to purchase such property as the purposes of the corporation should require, and it was objected that the property in controversy was not of that description, and that the corporation had no power to purchase it. The Court overruled the objection, saying: "Whether or not the premises in controversy are necessary for those purposes it is not material to inquire; that is a matter between the Government and the corporation, and is no concern of the defendant." The reason of the rule is obvious. As between the parties the purchase is valid, and it must be so as to third persons, until, by a proper proceeding, a forfeiture has been declared. It is well settled that a cause of forfeiture cannot be inquired into collaterally. As mere matter of opinion, it is proper for me to state that I regard the purchase in this case as valid; but in my view of the case, the question is an immaterial one.