[No. 3,699.]

# THE CITY AND COUNTY OF SAN FRANCISCO. *v.* THE SPRING VALLEY WATER WORKS.

FORMATION AND POWERS OF CORPORATIONS.—Corporations in this State, except for municipal purposes, must be formed under general laws, and can exercise no powers except such as are conferred by these general laws. The Legislature cannot confer on such corporations any powers or grant them any privileges, by special Act.

AN ACT GRANTING POWERS TO INDIVIDUALS WHEN THEY INCORPORATE. — An Act which grants to individuals and their assigns certain powers and privileges, and then provides that the Act shall not take effect unless the persons to whom the grant is made shall, within a certain time, organize themselves into a corporation under existing laws, is a grant, not to the individuals as persons, but to the corporation when formed.

IDEM.—Such Act is an attempt of the Legislature to confer powers and privileges upon a corporation by special Act.

IDEM.—When such persons organize themselves into a corporation under the general laws, the corporation possesses no powers or privileges except such as are conferred by general laws.

CORPORATIONS TO SUPPLY A CITY WITH WATER. — Private corporations, to supply a city with water, cannot be created by special Act, nor can the power to supply a city with water be conferred on a private corporation by special Act.

STARE DECISIS.—Even if property rights have grown up under an erroneous decision with regard to the construction of a clause in the Constitution, it is better that inconvenience should be submitted to, rather than such decision should stand, and a valuable provision in the fundamental law be obliterated.

GENERAL AND SPECIAL ACTS.—An Act which purports on its face to be, and is in fact, a special Act, cannot be converted into a general Act, by a declaration of the Legislature in another Act, that it shall be considered a general Act.

PURCHASE BY ONE CORPORATION OF PROPERTY OF ANOTHER.—If a corporation contracts with a city to supply it with pure fresh water for all purposes, except the sprinkling of streets, and the contract contains a clause, that if any other corporation receives permission to furnish the city with water on more favorable terms, the same terms shall be extended to the corporation contracting; and if another corporation is granted more favorable terms, and then purchases the rights and franchises of the old corporation, it does not thereby become bound by the contract, but may supply the city on the terms it enjoyed before the purchase.

GRANT OF EASEMENT IN STREETS.—The State has no proprietary interest in the streets of a city dedicated to public use; and when it grants to a private corporation an easement over the streets, not common to the public at large, it merely grants, in its sovereign capacity, a franchise, and not any proprietary interest in the streets.

FEE IN STREETS.—As a general rule the fee of the streets in a city, dedicated to public use, is in the owners of the adjoining lands, on each side, to the centre of the street.

GRANT OF EASEMENT IN A STREET.—A grant of an easement in a street, made by the Legislature to a corporation, is purely a grant of corporate power, and therefore cannot be made to a private corporation by special Act.

ACT UNCONSTITUTIONAL IN PART AND GOOD IN PART.—When a portion of an Act is constitutional, and another portion is unconstitutional, and the two are so inseparably blended together, as to make it clear that either clause would not have been enacted without the other, the whole Act is void.

APPEAL from the District Court, Fifteenth Judicial District, City and County of San Francisco.

On the 15th day of June, 1857, a corporation, called the San Francisco Water Works, was formed, under an Act

entitled "an Act to provide for the formation of corporations for certain purposes," passed April 14, 1853, as amended by an Act, approved April 30, 1855. This corporation introduced pure, fresh water into the City and County of San Francisco, in the year 1858. On the 23d of April, 1858, the Legislature passed the following Act:

"An Act to authorize George H. Ensign and others, owners of the Spring Valley Water Works, to lay down water-pipes in the public streets of the City and County of San Francisco.

"The People of the State of California, represented in Senate and Assembly, do enact as follows:

"Section 1. The said George H. Ensign and his associates and their assigns shall have the right, and the same is hereby granted to them and their assigns, to lay down distributing iron water-pipes in any of the public streets, ways or alleys of the City and County of San Francisco; *provided*, said pipes shall be so laid down as not to interfere with or obstruct any gas or water-pipes of any other parties, laid down by authority of law, for the purpose of introducing and furnishing fresh water for the supply of the inhabitants of said City and County of San Francisco; *provided*, that to the extent of three thousand running feet of said pipes be laid down within one year from and after the passage of this Act, and water furnished therefrom to such citizens along the line, street or streets where said iron pipes shall be laid down, as may elect to take the same and the balance of said iron pipes to be laid down as soon thereafter as practicable.

"Sec. 2. Said streets or ways in which said iron pipes may be laid, to be placed in the same good order and condition, by said Ensign and his associates or assigns, as the same were before said pipes were laid down, at his or their cost and charge, and under the supervision of the Superintendent of Streets and Highways, and to his satisfaction.

"Sec. 3. The Chief Engineer of the Fire Department, under the direction of the Board of Supervisors of said City and County of San Francisco, shall have the right to

tap any pipes so laid down, and connect hydrants therewith, for the extinguishment of any fire or fires, during the pendency of the same, free of charge, to the full capacity of the said water-works, up to, and until such time as water shall be introduced into said city and county by some other serson or persons; thereafter said Ensign and his associates or their assigns shall furnish for fire and other municipal uses their quota or proportion of whatever water may be produced by them, or may be introduced by any other person or persons.

"Sec. 4. The rate or price to be charged for water, with the exception mentioned in section three of this Act, shall be fixed by five commissioners, two of whom shall be appointed by the Board of Supervisors, and two by the parties named in section one of this Act; and they shall choose a fifth, and the rates agreed upon and fixed by a majority of said commissioners shall be the rates charged and received; *provided,* that the rates so established shall not be so low as to yield less than twenty per cent. per annum on the actual capital invested in said works.. And whenever the said City and County of San Francisco shall become the owner of any other works for the supply of the said city with fresh water, from any source west or south of the charter line of 1851, then the said City and County may also purchase all the works, appurtenances and franchises belonging to said grantees herein, or their assigns, as provided in section five; and if the said City and County shall not elect to purchase, as provided in this section, then the Board of Supervisors, if not otherwise provided for by law, may fix the rates for water, but shall not fix the rates for water supplied by the grantees herein, below the rates charged by the City and County for water delivered from the works of said City and County.

"Sec. 5. The City and County shall have the right, after the expiration of twenty years from the passage of this Act, on giving six months' notice of their intention so to do, to purchase all the works and franchises hereby granted belonging to said Ensign, his associates or assigns, which may be in use for the purpose of supplying water to the

people of said City, at their true value, to be determined by
a Board of Commissioners, to consist of four persons, who
shall be civil engineers, two to be designated by the then
corporate authorities of said City and County, and two by
owners of said water-works and property; and, in the event
of their disagreement, the said commissioners shall have
the right to select a fifth commissioner, and the decision of
a majority of said Board shall be final.

"Sec. 6.   That privileges herein granted to said parties,
named in section one of this Act, shall be limited to a
period of thirty years.

"Sec. 7.   Nothing in this Act shall be construed so as to
interfere with any existing rights of either the Mountain
Lake or San Francisco City Water Works Companies.

"Sec. 8.   This Act shall not take effect unless the parties
named in section one shall, within sixty days after its pas-
sage, duly organize themselves in conformity with the ex-
isting laws regulating corporations, now in force in this
State.

"Sec. 9.   All laws and parts of laws inconsistent with any
of the provisions of this Act are hereby declared to be in-
operative, so far as provision is otherwise made by this
Act."

Said Ensign and his associates soon after formed a cor-
poration under the name of "The Spring Valley Water
Works;" and also introduced water into the City.   On the
11th of April, 1859, the following amendment was passed:

"An Act to amend an Act entitled 'An Act to authorize
George H. Ensign and others, owners of the Spring Valley
Water Works, to lay down water-pipes in the public
streets of the City and County of San Francisco,' passed
April 23d, 1858.

"The People of the State of California, represented in Sen-
ate and Assembly, do enact as follows:

"Section 1.   Section one of said Act is hereby amended
so as to read as follows:

"Section 1. The said George H. Ensign and his associates
and their assigns shall have the right, and the same is here-

by granted to them and their assigns, to lay down distributing iron water-wipes in any of the public streets, ways or alleys of the City and County of San Francisco; *provided,* said pipes shall be so laid as not to interfere with or obstruct any gas or water-pipes of any other parties, laid down by authority of law, for the purpose of introducing and furnishing fresh water for the supply of the inhabitants of said City and County of San Francisco; *provided,* that to the extent of three thousand running feet of said pipes be laid down within two years from and after the passage of this Act, and water furnished therefrom to such citizens along the line, street or streets where said iron pipes shall be laid down, as may elect to take the same; and the balance of said iron pipes to be laid down as soon thereafter as practicable.

"Section 2. Nothing herein contained, or contained in the Act passed April 23, 1858, shall in any manner inure to or be so construed as to affect any rights or privileges heretofore granted to either the Mountain Lake Water Company or the San Francisco City Water Works Company."

On the 29th of August, 1859, the Board of Supervisors of the City and County of San Francisco passed the following ordinance:

"Order No. 172, amendatory to Order No. 46, and repealing Order No. 65 and Order No. 92, in relation to the San Francisco City Water Works.

"The People of the City and County of San Francisco do ordain as follows:

"Section 1. Section one of Order No. 46 is hereby amended so as to read as follows:

"Section 1. The San Francisco City Water Works, a company duly incorporated according to the laws of this State, and their successors and assigns, shall be allowed to introduce pure fresh water for fire, municipal and other purposes into the City and County of San Francisco, through any lands claimed as belonging to the City and County of San Francisco, and to conduct water from a dam to be con-

structed near the mouth of "Lobos Creek," so-called, by means of a suitable aqueduct of sufficient capacity to carry all the water of said stream, commencing at a point near the mouth of said creek, thence following, along the shore of the Bay, to some suitable point at North Beach, near the foot of Van Ness Avenue, at or near which point the said Company shall build a reservoir of not less than fifty thousand gallons capacity, and the said work shall be forfeited to the City and County of San Francisco, if not completed as specified in this section, on or before the 1st day of January, 1860, unless the progress of the work be suspended by law, in which case an additional time shall be allowed to the Company equal to the period during which the progress of the work may have been suspended, as aforesaid; *provided*, said Company shall use all due diligence in relieving themselves from all such legal impediments."

The following is section four of Order No. 46:

"The said City and County, under the direction of the Board of Supervisors, shall be entitled to the free use of the water so introduced, for the purpose of extinguishing fires, and for the supply of all hydrants, fire-plugs, pumps, and cisterns, and for all the public purposes of said City and County, except for sprinkling the streets; and the City and County shall have the right, under the direction of the Board of Supervisors, to tap the pipes and connect the same with hydrants, fire-plugs, cisterns, and other public works, at such places as they may deem proper."

The following is section eight of Order No. 46. This order was passed August 3, 1857.

"Section 8. It is hereby provided that should any other company, person or persons receive permission to introduce water for the purpose of supplying the City and County therewith, no more favorable terms shall be granted to such company or persons than to the company authorized under this order, without extending the same terms to the San Francisco Water Works."

Ordinance number one hundred and seventy-two was ratified and confirmed by an Act of the Legislature, ap-

proved April 12, 1860. On the 12th of April, 1863, the
following Act was passed.

An Act to extend the rights and privileges of the San
Francisco City Water Works. Approved April 8, 1863.

"The people of the State of California, represented in Sen-
ate and Assembly, do enact as follows:

"Section 1. In accordance with the recommendation of
the Board of Supervisors of the City and County of San
Francisco, expressed in resolution number twenty-three
hundred and twenty-four, passed January 5, 1863, and ap-
proved January 6, 1863, in relation to the San Francisco
City Water Works, the said company are hereby relieved
and discharged from any and all obligations whereby it has
agreed to pay the said City and County of San Francisco
five per cent. of its gross earnings.

"Section 2. It is hereby provided, that should any other
company, person or persons, excepting the City and
County of San Franisco, receive permission to introduce
water for the purpose of supplying the said City and County
therewith, no more favorable terms shall be granted to
such company, person or persons, than are now enjoyed by
the San Francisco City Water Works, without extending
the same to the latter company.

"Section 3. It is hereby provided that any rights, privi-
leges or immunities now enjoyed by the Spring Valley
Water Works, by virtue of an Act, entitled 'An Act to
authorize George H. Ensign and others (owners of the
Spring Valley Water Works,) to lay down water-pipes in
the public streets of the City and County of San Francisco,'
approved April 23, 1858, which are more favorable than
the terms heretofore granted to the San Francisco City
Water Works, shall be held and enjoyed by the said com-
pany.

"Section 4. This Act shall take effect from and after its
passage."

On the 13th day of February, 1865, the defendant became
the assignee of the franchises and property of the San
Francisco City Water Works, and since has been the only

corporation engaged in bringing fresh water into the city. One of the public squares in the city is called Portsmouth Square, and the city had been in the habit of tapping the mains of the defendant and obtaining water with which this square was irrigated. In the latter part of 1868, the defendant notified the city authorities that it should prevent the city from taking water from its water-works for any public or municipal purpose, except for the extinguishment of fires, unless the city paid, or made arrangement for paying for the water taken, other than for the extinguishment of fires. This action was brought in March, 1869, to restrain the defendant by injunction from carrying out its threat. This is the second appeal. The report of the case on the former appeal is found in the 39 Cal. p. 473. Counsel stipulated to waive the question of its being a proper case for an injunction. The Court below rendered judgment for the defendant, and the plaintiff appealed.

The other facts are stated in the opinion.

*W. C. Burnett* and *John F. Swift*, for the Appellant.

To make the argument perfect that the Ensign Act is unconstitutional, it is necessary that there should be but one thing known to the law as a franchise, namely, the privilege of being a corporation. On the contrary, there are many other franchises known to the law, and fresh ones are being created by statute constantly, as the growing and changing exigencies of society require them. The invention of telegraphy, the introduction of railroads, gas-light, etc., have materially added to the number of privileges that may be designated as franchises.

To be a corporation was only one among the many forms of that kind of property known to the common law. True, it is a franchise for a number of persons to be incorporated, and subsist as a body politic, with a power to maintain perpetual succession, and do other corporate acts; and it is true that each individual member of such croporation is said to have a "franchise," or freedom.

This thing called a corporation, is the franchise, that our

constitution declares shall be formed under general laws, and shall not be created by special act.

But there are a vast number of franchises, besides that of being a corporation, known to the common law; nor is a franchise, in its nature, limited to such privileges as have before existed, for new ones may be created, and are being constantly created.

In England, a franchise has been defined as a royal privilege, a branch of the crown prerogative, subsisting in the hands of the subject. Gifts of waifs, estrays, wrecks, treasure-trove, royal fish, and forfeiture, all of which are the prerogatives of the crown, are franchises. The rights of forest, park, chase, warren, and fishery, are also franchises, no subject being entitled so to apply his property for his own convenience.

A county palatine is the highest species of franchise, as within it, the earl, constable, or other chief officer, may exercise without control the highest functions of the sovereign. And as the crown may thus erect an entire county into an independent jurisdiction, so it may create a liberty or bailiwick independent of the sheriff of the county. This, then, is a franchise. The right to hold a fair, or market, or to establish a ferry, and to levy tolls thereon, are also each a franchise. So much for the common law.

Franchises are property, and fall within that classification of property known to the law as incorporeal hereditaments. In this State, franchises can only be granted by the Legislature. But they may be granted to any individual capable of holding property, and either by special act, save in the case of becoming a corporation, or under and by virtue of general laws applying to all. They may be granted directly by the Legislature to a corporation in existence, or to one or more individuals; and when vested in an individual, may be granted or conveyed either to another individual, or to any corporation authorized by law to hold such property, and when so conveyed they may be exercised by the grantee.

What was in the mind of the Constitution makers, when they enacted that corporations should only be created

under general laws, is not quite clear.  Probably they individually intended to prevent the grant of charters of incorporation, combined with other special privileges, all in the same act, such as banking corporations, insurance corporations with special banking privileges, and land speculating corporations with special rights deemed dangerous to the public weal, which about that time had led to corruption and other abuses in the Atlantic States.  But whatever the individual members of the constitutional convention were driving at, it is certain that when they got together they only used "apt words" to prevent the creation by special act, of that one franchise, of being a corporation, and no other.   All other franchises were left to the discretion of the Legislature.  And for nearly a quarter of a century they have been granted without hesitation, and for all purposes save that one alone of being a body politic and corporate, and the legality of these grants of franchises has never been questioned.   The telegraph and railroad companies are constantly receiving special grants of franchises; so with plank-road companies, and ferry companies, and bridge companies.

Having once formed as corporations under the general laws, enacted for that purpose, as the Constitution provides, they are ready to receive, and in law capable of receiving, holding, and exercising, grants of franchises, the same as of lands, goods, money, or any other species of property.

Take the case of the ordinary horse railroads, now so universal in this State.

These organizations begin by forming as corporations under the general laws, the object or purposes being stated in the deed of incorporation, to construct and operate horse railroads in this State.   By this proceeding, the associated projectors obtain the franchise of being a corporation.  This done, they are ready to commence business.   But before they can successfully prosecute the work, they must acquire more or less property of various kinds, real and personal, corporeal and incorporeal.   They must have real estate, such as of land for stables. They must have personal property in the way of horses, harness and cars.   They

must have incorporeal property in the character of rights of way for laying down and operating their tracks, and in many cases, they have a distinct franchise in the right to condemn private property for the purposes of the road, and also a franchise to levy and collect tolls.

Ferry companies and plank-road companies, and bridge companies, and wharf companies, are formed in precisely the same way. They are first organized into corporations under the general law, as the Constitution provides, and then being capable of taking and holding property, the franchises of condemning property sometimes, when necessary, and always the franchises of levying and collecting tolls are granted to them; or, as is often the case, having been already granted to an individual, are conveyed to them by deed, so that they can prosecute their business successfully.

The case of Ensign and his associates is strictly like the foregoing. They desired to introduce water into San Francisco, and in order to do so profitably, wanted various franchises and privileges of an incorporeal nature, such as ways, easements and riparian rights, some of which could be obtained by virtue of general laws only, and others which required special legislative grants. There was a general law in existence passed the day before the Ensign Act, permitting the formation of corporations for introducing water into cities. So far as the franchise of being a corporation was concerned, in consequence of a peculiar provision of our Constitution, that could only be obtained under general laws. But the other franchises required, and especially the right to levy and collect tolls, or rates, were within the control of the Legislature. The provision on this point in the general law was not satisfactory, because it placed the regulation of the rates which were to provide for profit to the promoters, under the control of a board of five Commissioners, two of whom were to be appointed by the city authorities, and a third substantially with the Sheriff, so that a majority of the board might be hostile to the company, and so might make the business a losing affair.

For it must always be borne in mind that in the general

law there was no provision, requiring the "water rates" to bear any relation to the amount of capital invested.

Such being the condition of affairs, they naturally sought the aid of a special law, and obtained it in the Ensign Act. By this Act there is no attempt at a grant of the franchise of being a corporation. On the contrary, the Legislature, recognizing its incapacity to specially create and grant that franchise by special Act, turned them around, in express terms (see section 8 of the "Ensign Act,") to the general laws, to acquire it, and to qualify themselves for holding and exercising the distinctive and peculiar "franchise," of levying and collecting "water rates," and of fixing those rates so that twenty per cent. profit could be obtained on the capital to be invested.

The Ensign Act is therefore not unconstitutional, as it does not form or create a corporation in any sense.

But if it did, can the defendant, after organizing with an express recognition of its requirements, and after having obtained, and for fifteen years enjoyed the advantages therein granted—privileges far superior to those possessed by any other company—when now called upon to perform its part of the contract, and after admitting, and even asserting it as a right, in the pleadings, and all the way through the suit up to this point, that it holds under and by virtue of the Ensign Act, now, on the second visit to this Court, be allowed to avail itself of such a plea? Can it plead its own incapacity in order to escape its duties? Would not such a defense be a fraud upon the public?

If this act is unconstitutional, and the defendant has been in the position of an usurper and wrong-doer all of these years, can it be allowed at this late day, or at any day, to take advantage of its own wrong?

The Constitution, in section thirty-seven, article four, imposes a duty upon the Legislature. It provides for the organization of cities, towns and incorporated villages; that is to say, it provides for the formation of municipal corporations.

Section thirty-one of article four, contains two clauses, each framed for a distinctive and specific purpose. The

first to prevent an evil then prevalent in the new States of the south and west, by which corporations had been clothed generally by underhanded, and often by corrupt legislation, with important special and oppressive privileges, and perhaps to prevent the time of the Legislature from being consumed in passing special bills.

The second clause was designed to overcome the doctrine laid down in the Dartmouth College case.

The constitutional inhibition being a restriction upon the State legislative power, it follows that but for the first clause, the Legislature could create any corporation, either by general or special act, at its pleasure. A "municipal corporation," being a mere branch of the government, never fell within the Dartmouth College doctrine, and therefore could be repealed or modified at any time. But the first clause does not use the words "municipal corporation," but says corporations formed for "municipal purposes." Does that mean city, town or village charters merely, viz: strict municipal corporations, or does it foresee and provide for the possibility that the Legislature in its wisdom might determine to create corporations for "municipal purposes," to be composed of and managed by private individuals as auxiliary to, and in aid of the strict municipal corporations provided for, and commanded in section thirty-seven, such as gas companies, water companies, and the like? If not, then why provide for the formation of municipal corporations in section thirty-seven? Why designate the corporations excepted from the operations of the first clause of section thirty-one, corporations for municipal purposes, instead of the well-known and established term of municipal corporations?

And, lastly: and to this I call the special attention of the Court. Why provide, as is done in the second clause of section thirty-one, that the special Acts passed pursuant to that section shall be subject to alteration or repeal? That the general Acts would require a special constitutional reservation to overcome the rule in the college case, is true. But if the corporations to be created by special Act for municipal purposes were mere municipal corporations,

·organizing cities, towns and villages, then the reservation ·of the power to repeal and alter them was wholly useless and unnecessary.

*Charles N. Fox* and *A. Campbell, Sr.*, for the Respondent.

*S. M. Wilson* and *J. P. Hoge*, also for the Respondent. ˙

What does the Constitution mean by the language, that "corporations may be formed under general laws, but shall not be created by special Act?" It certainly did not refer to mode and manner, merely, of legislation on the subject. It had a deeper meaning, a more profound intention, a much sounder policy. It certainly had in view the powers, privileges, franchises and immunities of corporations; and none of these were left to special legislation, but were required to be given, controlled and limited by the general laws on the subject. The corporation itself is a franchise, .and is defined by Mr. Justice BLACKSTONE to be a franchise. He says it is "a franchise for a number of persons to be incorporated and exist as a body politic, with a power to maintain perpetual succession, and to do corporate acts, and each individual of such corporation is also said to have a franchise, or freedom." (2 Bl. Com. 37; see also *Dartmouth College* v. *Woodward*, 4 Wheat. 657.)

If these corporate powers be, then, franchises, we must look to the general law for all the franchises any corporation can enjoy. If it does not enjoy them under the general law, under what law does it hold them? The extent of the franchises of a corporation is to be determined by the charter. (*Auburn and Cato Plank Road Co.* v. *Douglass*, 9 N. Y. R. 451.)

Mr. Bouvier, in his Law Dictionary (Word Franchise), says in regard to franchises, "in the United States they are usually held by corporations created for the purpose, and can be held only under legislative grants." He cites a large number of cases. Apply to this the language of the Constitution of California prohibiting special acts and requiring all corporations to be formed under general laws, and the result seems plain—that the general law must be

regarded alone in determining the franchises which may be enjoyed by a corporation, and that it can have none but what the general law gives.

These corporate franchises were held, in the great Dartmouth College case cited, to be inviolable, and that they were protected by the Constitution of the United States as contracts. For this reason, also, our Constitution prohibited special acts, and made all the general laws liable to alteration or repeal at the will of the Legislature. The power to alter or amend is limited to the general laws and the special acts relating to municipalities. If any special act can give powers and privileges to a particular corporation, it follows, within the principles of the Dartmouth College case, that a contract results, which, under the Constitution of the United States, is inviolable. There is, then, but one rule of safety under the Constitution of the State, and one mode alone of maintaining its manifest policy; and that is to confine all corporations to the general law under which they are formed, and denying them any powers, privileges or franchises derived from any special law.

The Ensign Act seems to be an ingenious attempt to evade the Constitution—an attempt to comply with the letter, but a design to accomplish what its spirit forbids. A franchise was "created by special act," and given to "George H. Ensign and his associates." In section one it is called a "right," in section six, a "privilege," whilst in section five it is called a "franchise." But the entire vesting of these rights, privileges and franchises, all depend (by section eight) upon the condition precedent, that Ensign and his associates shall "duly organize themselves in conformity with the existing laws regulating corporations now in force in this State."

Now, is it not indisputable that the Legislature intended that "Ensign and his associates" should not have, take, or enjoy these franchises as individuals? Is it not manifest that they would take merely as corporators? Was not the whole law made to "take effect" only by virtue of the act of becoming incorporated? After that act of incorporation, would not the company take the franchise rights and privileges

granted, as the intended grantee ? We respectfully submit that words cannot make this plainer; and that if the Court cannot look through the flimsy guaze-work which covers this Act, the Constitution itself is too easy of evasion to afford any protection against legislative power.

We respectfully submit that the Ensign Act is unconstitutional.

*McAllisters & Bergin,* also for the Respondent.

*Charles N. Fox, A. Campbell, Sr.,* and *J. P. Hoge,* also for the Respondent.

By the Court, Crockett, J.:

On the former appeal, and at the first hearing of the present appeal, it was assumed, by both Court and counsel, that the rights and obligations of the defendant were to be ascertained by reference to the Act of April 23d, 1858, authorizing Ensign and his associates to lay down water-pipes in the streets of San Francisco. But on the rehearing the point is made for the first time by the defendant that the Ensign act is unconstitutional and void, and consequently can confer no rights on the plaintiff nor impose any duties on the defendant. The eighth section of the Act is in these words: "This Act shall not take effect unless the parties named in section one shall, within sixty days after its passage, duly organize themselves in conformity with the existing laws regulating corporations now in force in this State."

It is contended that this is an attempt to confer corporate rights by a special Act upon Ensign and his associates, in violation of section thirty-one, article fourth, of the Constitution, which provides that "corporations may be formed under general laws, but shall not be created by special Act, except for municipal purposes. All general laws and special Acts passed pursuant to this section may be altered from time to time, or repealed." The Act in question does not purport to organize Ensign and his associates as a cor-

poration. On the contrary, it requires them to "organize themselves in conformity with the existing laws regulating corporations," as a condition on which they shall become entitled to the benefits and privileges enumerated in the Act. It is clear, therefore, that the corporation, when formed, did not derive its corporate existence from the Ensign Act; nor could it have done so under the Constitution. But it is claimed that, under this provision of the Constitution, corporations must not only be formed under general laws, but that their rights, duties and obligations must be prescribed in the same method, and cannot be created by special Acts. On the other hand, it is insisted that the Constitution is wholly silent as to the powers and duties of corporations, and goes no further than to require that they shall be "formed" under general laws, and prohibits them from being "created by special Act;" but left the Legislature free to confer upon them, by either general laws or special Acts, such powers as it shall see fit. If this theory be correct, the constitutional provision has imposed upon the Legislature only the duty of providing by general laws the formulas by which corporations may be formed— the mere routine by which an artificial entity may be created, but has in no degree limited the power of the Legislature to confer upon it by special grant, at its discretion, any powers or privileges of whatsoever nature. On this construction, it would be competent for the Legislature to provide, by a general law, that any number of persons might become a body corporate, on filing a certificate stating their intention to that effect, and the name of the corporation; and the Legislature might then, by special grant, confer on the corporation any powers, however great, and any privileges, however diversified. It might authorize it to construct railroads, to transact the business of banking or insurance, deal in lands, and establish steamship lines. There would be no limit to its power in this respect. Nor when once granted by special Act could these privileges be recalled or modified by the Legislature. The grant, and its acceptance by the corporation, would have created a contract, the obligation of which could not be impaired by any subsequent legislation.

Long prior to the adoption of our Constitution, experience had demonstrated the enormous evils resulting from legislation of this character. By means of hasty or corrupt legislation, great monopolies had been created, which were beyond legislative control. Capital was aggregated in the hands of large corporations, with peculiar and oppressive privileges, frequently procured through venal legislation. There was no uniformity in the powers exercised by corporations pursuing the same business. So long as they derived their powers, privileges and immunities from special legislative grants, these, of course, varied according to the temper of the Legislature; and the result was that each succeeding corporation had greater or less powers than its predecessors. With no limitation upon the discretion of the Legislature in respect to the particular powers and privileges to be granted to each, nor as to the innumerable purposes for which corporations might be formed, nor as to the term of their duration, gross abuse necessarily resulted from such a system. Extraordinary privileges, oppressive powers and onerous monopolies were conferred upon some and denied to others engaged in the same business. Their powers were frequently enlarged, and the terms of their duration extended by special grant. Under this system there was danger that large aggregations of capital would so practice upon the credulity or venality of legislative bodies as to secure the most oppressive monopolies, and seriously interfere with the enterprise and industry of the individual citizen. One of the latest and most startling illustrations of this danger is to be found in an Act of the Legislature of Louisiana, passed in the year 1869, by which a corporation was created by special grant, with the exclusive right to establish and maintain slaughter-houses and landings for cattle for a period of twenty-five years in the city of New Orleans and several of the contiguous parishes. The Constitution of Louisiana contains no limitation on the power of the Legislature to confer corporate rights by special Act, and the validity of this statute has been upheld by the Supreme Court of the State and of the United States. But this unrestricted power to

endow corporations with peculiar and exclusive privileges would be less dangerous if a succeeding Legislature could correct the abuses practiced by its predecessor, and abolish or restrict the privileges once granted. It has been settled, however, by a long line of decisions, that corporations created by special Acts of the Legislature, and endowed by their charters with certain rights, cannot be deprived of them without their consent; that the Act of Incorporation creates a contract between the State and the corporation, which is protected by the Constitution of the United States, which prohibits any State from passing laws impairing the obligations of contracts. Powers improvidently conferred by special Acts, however onerous, cannot, therefore, be revoked or modified except with the consent of the corporation.

It was the especial purpose of the framers of our Constitution to guard against these abuses by providing that "corporations may be formed under general laws, but shall not be created by special Act, except for municipal purposes." Nor were they content to leave it doubtful whether the Legislature would have power to modify or abrogate these general laws or special acts to create municipal corporations, so as to affect the rights of existing corporations. Hence, the Constitution contains the further provision that all general laws and special acts "passed pursuant to this section may be altered from time to time, or repealed." It was intended by this provision to keep corporations within a wholesome legislative control, and to repel the assumption that their rights were held under a contract, which the Legislature was powerless to modify. Under these provisions the source from which private corporations must derive their powers and immunities is perfectly apparent. They can only " be formed under general laws," and can exercise no powers, except such as are derived from general laws. If this provision means nothing more than that the Legislature shall prescribe the mere formula by which a corporate entity may be called into life, and may then proceed to confer upon it by special act, at its discretion, extraordinary powers and privileges which

it could not afterwards revoke or modify, because they were granted under special, and not general laws, then, indeed, has the Constitution signally failed to provide a remedy for the abuses already adverted to. On this construction, when a railroad corporation is once formed under a general law, the Legislature, by special grant, may confer upon it extraordinary powers, greatly in excess of those exercised by other similar corporations. It may authorize it to engage in banking, mining, or any other business enterprise, or to charge higher rates of fare than are permitted to other competing roads. In like manner it might discriminate in favor of a particular banking corporation, or confer special, or, perhaps, exclusive privileges on a particular mining, insurance or manufacturing corporation. But on the other, and the true construction of this constitutional provision, all private corporations must derive their powers from general laws, and not from special statutes. The general laws under which they were formed, and such others as shall afterward be enacted, must alone define their rights and powers. On this theory, all private corporations, formed for similar purposes, will stand upon the same footing, enjoy the same rights, and be subject to the same burdens, which cannot be increased or diminished, except by general laws applicable to all. In harmony with this theory, and accepting this as the true construction of the Constitution, the Legislature, at its first session, enacted general laws under which private corporations might be formed, and defining minutely their powers and duties. These laws have been modified from time to time, but have never omitted to prescribe the powers to be exercised and the duties to be performed by the corporation. Nothing short of some imperative rule of constitutional construction would justify us in holding, at this late day, that, though corporations must be "formed" under general laws, it is nevertheless competent for the Legislature, by special grant, to confer upon a corporation once organized, any powers, however extraordinary. We think, on the contrary, that no corporate rights or powers

Cal. Reps. XLVIII—33

can be conferred by special grant, but must all be derived under general laws.

This brings us to the consideration of the Ensign Act, so-called. The first seven sections confer upon Ensign and his associates certain privileges, and impose upon them certain duties in respect to furnishing the city and county of San Francisco with water for the extinguishment of fires, and other municipal uses. Section eight, already quoted, provides, that "this Act shall not take effect unless the parties named in section one shall, within sixty days after its passage, duly organize themselves in conformity with the existing laws regulating corporations now in force in this State." The grant, therefore, was not to take effect until Ensign and his associates had become a corporation under existing laws. It took effect as a grant, not to Ensign and his associates as private individuals, but to the corporation when formed. It was an attempt by the Legislature to confer, by special grant, upon a private corporation about to be formed, certain peculiar privileges, and to subject it to certain duties not common to other corporations formed under the same general law. For the reasons already stated, this was not within the constitutional power of the Legislature. When Ensign and his associates became a corporation under the general law, they took only such rights as were derived from that law, and were subject only to such duties as it imposed. The Legislature, by special Act, could not increase or diminish either.

On the first appeal, and at the former hearing on the present appeal, this point was not mooted, nor our attention directed to it by counsel; and in the view we then took of the case, our opinion was that the rights of the parties were to be determined by the Ensign Act, though on the first appeal this point was not necessarily involved in the decision. We see no reason to change the views we then expressed, if it be assumed that the Ensign Act was a valid and constitutional enactment. But we are satisfied it is not, and must be disregarded in determining the relative rights and duties of the parties. Tested by the general law under which the defendant was organized, it is under no

obligation to furnish water to the City and County free of charge, except for the extinguishment of fires, during the pendency thereof.

Judgment and order affirmed.

The foregoing opinion was delivered at the April term, 1874, and a rehearing having been applied for, the following opinion, denying the same, was delivered at the July term, 1874.

In the former opinion on this appeal, we held that the Act of April 23, 1858, known as the "Ensign Act," is in violation of Art. IV, section thirty-one of the Constitution, which provides that "corporations may be formed under general laws, but shall not be created by special Act, except for municipal purposes." A rehearing is asked, partly on the ground that this clause of the Constitution has received a different construction in the case of the *California State Telegraph Company* v. *Alta Telegraph Company* (22 Cal. 398); and that this decision has become a rule of property in this State, and ought not now to be disturbed, even though it was erroneous. After a careful examination of that case, I am satisfied it cannot be sustained, either on reason or authority. Mr. Justice CROCKER, in delivering the opinion of the Court, refers to several adjudged cases as supporting the conclusions at which he arrived; but an examination of these cases shows that they were misapprehended by the Court, and do not support the decision.

The first case referred to was *Aurora* v. *West*, (9 Ind. R. 85.) The City of Aurora was incorporated by special Act, before the adoption of the new Constitution; and, by its charter, was expressly authorized to subscribe for stock "in any chartered company, for making roads to said city." The charter of the city was continued in force under the new Constitution, and the city subscribed for stock in a railroad company, incorporated to construct a railroad from St. Louis to Cincinnati, the route of which was so located as to pass through Aurora. The action was to enforce pay-

ment of the bonds issued by the city to aid in the construction of the road. The power of the Legislature under the new Constitution (which provides that "corporations, other than banking, shall not be created by special Act, but may be formed under general laws"), in respect to conferring powers upon a corporation by special Act, was not involved in the case; and the point decided was that the Constitution imposes no limit on the Legislature as to the powers to be conferred on corporations by special Act, before the adoption of the new Constitution, and by general laws afterward. But the Court adds "under this Constitution, the law creating a corporation will be the index to the objects for which it was created, and to the powers with which it is endowed, if the grant does not conflict with some other provision of the Constitution than those above-named, or exceed the power possessed by the Legislature itself." So far from lending support to the decision in the *California State Telegraph Company* v. *Alta Telegraph Company*, the extract above quoted maintains a proposition wholly at variance with that decision.

The next case referred to by Mr. Justice CROCKER, is *Gifford* v. *The New Jersey R. and T. Company*, (2 Stockton, Ch. R. 171.) It will suffice to say of this case that the Constitution of New Jersey then contained no provision prohibiting the Legislature from creating corporations by special Act, and, of course, the question involved here could not have arisen in the case.

The next case referred to was the *C. P. and A. Railroad* v. *Erie* (27 Penn. St. R. 380). The Constitution of Pennsylvania provides that no law shall create, renew, or extend the charter of more than one corporation; and the question before the Court was, whether a certain Act of the Legislature had attempted to do either of these things. The decision was in the negative, and, of course, could have involved no point analogous to that under discussion here.

The only remaining case referred to was the *Syracuse City Bank* v. *Davis* (16 Barb. 188). The Constitution of New York provides that "the Legislature shall have no power.

to pass any Act granting any special charters for banking purposes; but corporations or associations may be formed for such purposes under general laws." The Syracuse City Bank was organized under the general law; but, in some trifling particulars, the forms prescribed by the general law were not complied with, and the Legislature passed a curative Act, to the effect that the bank should be deemed a valid corporation and to have been duly incorporated, notwithstanding these informalities. The Court held the Curative Act to be valid, on the ground that it did not create a corporation, but only remedied defects in the organization of one already created. That proposition has no analogy to the question involved here, which relates to the power of the Legislature to confer upon an existing corporation, by special Act, other powers than those derived from the general law. These are the only cases referred to by Mr. Justice CROCKER, and none of them support his ruling.

The decision is wholly unsupported by authority; and after, apparently, the most laborious research, counsel have failed to produce on the argument of this appeal, a single adjudicated case, or an extract from any work on constitutional law, which lends the slightest support to the ruling in the *State Telegraph Company* v. *Alta Telegraph Company.* In the annals of American jurisprudence, that case, so far as I am advised, stands as the sole exponent of the propositions which it enunciates. On the other hand, authorities are not wanting in support of the opposite construction of this clause of the Constitution. In *Low* v. *The City of Marysville* (5 Cal. 214), the question was whether it was competent for the Legislature, by special Act, to authorize the city (a municipal corporation) to subscribe for stock in a steamboat company organized to establish a line of steamers plying between that city and San Francisco. In delivering the opinion of the Court, Chief Justice MURRAY holds, that "the powers of municipal corporations must be confined strictly to police or governmental purposes," and that the power conferred upon the corporation to subscribe for stock in a railroad, could not be granted by special Act; "for as it would have been in violation of the Constitution

to create an incorporation by special Act, for other than municipal purposes, it follows that it would be equally unconstitutional to confer special power on a corporation already created.   In other words, it would be doing by two Acts that which the Legislature could not do by one; and corporations for almost every purpose might be created by special Act, by first incorporating the stockholders as a municipal body."   This reasoning, I think, is unanswerable, and the decision is a direct adjudication upon the question involved here.

The Constitution of Ohio contains these clauses:

"Section 1.  The General Assembly shall pass no special Act conferring corporate powers.

"Section 2.  Corporations may be formed under general laws; but all such laws may, from time to time, be altered or repealed."

In *Atkinson* v. *The M. & C. R. R. Co.* (15 Ohio State R. 35,) the Court, in construing these clauses, says: "Constitutional provisions would be of little value if they could be evaded by a mere change of forms.   These provisions of the Constitution are too explicit to admit of the least doubt, that they were intended to disable the General Assembly from either creating corporations or conferring upon them corporate powers by special acts of legislation. It was intended to correct an existing evil, and to inaugurate the policy of placing all corporations of the same kind upon a perfect equality as to all future grants of power; of making such laws applicable to all parts of the State, and thereby securing the vigilance and attention of its whole representation; and, finally, of making all judicial constructions of their powers, or the restrictions imposed upon them, equally applicable to all corporations of the same class.   We must give such a construction to the Constitution as will preserve its great leading objects intact."   The difference between the language of the Ohio Constitution and our own on this point is more in form than substance, as is apparent from the debates in the convention which framed the Constitution of this State.   The Constitution of Iowa provides that "the General Assembly shall not

pass local or special laws in the following cases: * * *
.for the incorporation of cities and towns," and for other
specified purposes. " In all the cases above enumerated,
.and in all other cases where a general law can be made ap-
plicable, all laws shall be general, and of uniform opera-
tion throughout the State."

The Legislature passed a special Act to amend the char-
ter of the city of Davenport, a municipal corporation, and in
_Ex parte Pritz_, (9 Iowa, 30,) the question before the Court ,
was, whether the Legislature, by a special Act, could
amend the charter of a municipal corporation, and thereby
place it upon a different footing from other municipal
corporations, organized under the general law. In consid-
ering this point, the Court says the intention of the Consti-
tution was " to prevent special or local legislation; to
require that the Legislature should pass general laws upon
all the subjects named, and in all other cases where such
general laws could be made applicable. There can be no
question but that it was designed to confine the Legislature
to general legislation, and leave the people, in their munic-
ipal capacity, to organize and carry on their government
under such general laws. If this be so, then to say that the
Legislature may not pass a law to incorporate a city, but
may, to amend an Act of incorporation in existence before
the adoption of the Constitution, or charters formed under
the general law, would make this provision of the Constitu-
tion practically amount to nothing. For if they may amend,
they may, to the extent of passing an entire new law, except
as to one section. Or they may at one session amend half
. the law, and at the next the other half; and thus the plain
and positive prohibition of the fundamental law be evaded.
By such a construction, the evil sought to be remedied
would continue, if possible, in a more objectionable form."
The same principle was substantially decided in the _Town
of McGregor_ v: _Bauliss_, (19 Iowa, 43.) It will be observed
that by the Constitution of Iowa, the prohibition of the
Constitution was against special laws " for the incorpora-
tion of cities and towns;" whilst in our Constitution the
provision is that corporations, except for municipal pur-

poses, shall not be "created" by special Act. In neither is the Legislature in express terms prohibited from conferring additional powers upon, or amending the charter of an existing corporation formed under the general law. The reasoning of the Supreme Court of Iowa, however, is conclusive on the point that, under our Constitution, the Legislature, by special Act, cannot either amend the charter of an existing corporation, or confer upon it powers and immunities not granted by the general law. The legal effect of the Ensign Act was precisely the same as though the corporation had already been formed under the general law, and the Legislature, by a special Act, had attempted to amend its charter by conferring upon it additional rights, and imposing upon it new obligations, different from those arising under the general law. That this was the legal effect of the Ensign Act was substantially decided in the case of the *Spring Valley Water Works* v. *San Francisco*, (22 Cal. 442,) the Court holding that the franchise granted to Ensign and his associates vested in the Spring Valley Water Company by operation of law, without an assignment, which was in effect holding that the grant was directly to the corporation. The Iowa cases are directly to the effect that this cannot be done under a constitutional provision strictly analogous to our own. No authority to the contrary has been produced, except the case of the *State Telegraph Company* v. *The Alta Telegraph Company*, which is supported by no other adjudication, nor by any text-writer, so far as I can discover, after a careful investigation. But the fact that it is directly opposed to all the authorities is not its only or its chief fault. Its reasoning is not only in conflict with the obvious meaning of the Constitution, but is subversive of one of its most important provisions. When the framers of that instrument ordained that corporations, except for municipal purposes, should not be "created" by special Act, they had in view the enormous evils which had resulted from endowing corporations with peculiar and often most onerous privileges, by special acts of legislation.

In the case of the *Dartmouth College* v. *Woodward*, (4 Wheat, 519,) it had been decided by the Supreme Court of

the United States, that privileges secured by special Acts of incorporation, constituted contracts, which were protected by that clause of the Constitution of the United States, which prohibits a State from passing laws impairing the obligation of contracts. That case was followed by numerous other decisions of like import, in the same Court, and in almost every State of the Union, including New York, Massachusetts, New Hampshire, Pennsylvania, Michigan, Iowa, Indiana, Illinois and Virginia. In his work on Constitutional Limitations (page 279) Judge COOLEY says: "It is under the protection of the decision in the Dartmouth College case that the most enormous and threatening powers in our country have been created, some of the great and wealthy corporations actually having greater influence in the country at large, and upon the legislation of the country, than the States to which they owe their corporate existence. Every privilege granted or right conferred, no matter by what means or on what pretense, being made inviolable by the Constitution, the Government is frequently found stripped of its authority in very important particulars, by unwise, careless, or corrupt legislation; and a clause of the Federal Constitution, whose purpose was to preclude the repudiation of debts and just contracts, protects and perpetuates the evil. To guard against such calamities in the future, it is customary now for the people, in framing their constitutions, to forbid the granting of corporate power, except subject to amendment and repeal; but the improvident grants of an early day are beyond their reach." In view of these calamities, the framers of our Constitution were not content merely to reserve to the Legislature the power of amendment and repeal; but prohibited in terms the power to create corporations, except for municipal purposes, by special Act; and almost every State which has recently amended its Constitution has followed our example. In the face of these facts it is altogether incredible that in forbidding corporations, except for municipal purposes, to be "created" by special Act, it was intended to provide only that the mere forms by which a corporate entity was created should

be prescribed by general laws; but that when thus formed, it may be endowed by special Act with any powers however diversified, at the discretion of the Legislature. On this theory, a banking corporation may be endowed by special Act, with power to build railroads, establish steamship lines, conduct mining or manufacturing enterprises, or to engage in any other business whatsoever. If this be the true construction of our constitutional provision, we are yet in the condition referred to by Judge COOLEY, when "the most enormous and threatening powers in our country" may be created; and when "some of the great and wealthy corporations" may hereafter exercise "greater influence in the country at large and upon the legislation of the country, than the States to which they owe their corporate existence." But it must be perfectly apparent to every unbiased mind, that this is not the correct interpretation of the Constitution, and that corporate powers cannot be granted, enlarged, or modified by special Act.

It is claimed, however, that the introduction of water into a city for the use of the inhabitants and of the corporate authorities, is a "municipal purpose" within the sense of the Constitution; and that private corporations may be created by special Act for such purposes. In *Low v. Marysville, supra,* it was decided that the term "municipal purposes," as employed in this section of the Constitution, referred only to governmental and police powers, and that the Legislature is prohibited from conferring, even upon a municipal corporation, by special act, any powers, except for police and governmental purposes." But, however this may be in respect to the corporation itself, it is clear that the right to introduce water into a city cannot be conferred upon a private corporation by special act, upon the plea that it was a corporation organized for "municipal purposes" in the sense of the Constitution. If the Legislature, by special Act, can confer such powers upon a private corporation for supplying a city with water, it can confer similar powers upon all corporations for similar purposes. It might by special Act incorporate a gas company to furnish the inhabitants with gas, or a coal or wood com-

pany to furnish them with fuel, or a paving company to pave the streets, or a slaughter house company to furnish the people with meat, or a milling company to supply them with bread. Every county in the State is a *quasi* municipal corporation; and it is the duty of the corporation to see that proper roads, bridges and public buildings are provided for the use of the inhabitants. On this theory, the Legislature, by special Act, might organize private corporations for all these purposes, and endow them with peculiar oppressive, and perhaps exclusive powers and privileges. In this way the constitutional prohibition would be frittered away, and would practically amount to nothing. It is too plain to admit of debate, that the provision permitting corporations "for municipal purposes" to be created by special Act, refers only to corporations for governmental and police purposes, and not to private corporations of any character or for any purpose.

It is further claimed that the decision in the case of the *California State Telegraph Co.* v. *The Alta Telegraph Co.,* has become a rule of property, and ought not now to be disturbed, even though it be conceded to be erroneous. In support of this proposition we have been referred to numerous statutes claimed to be similar to the Ensign Act, under which it is said great property rights have grown up. It may be that some, but I think no serious injury will result to property rights from overruling that decision. If it shall be found that serious inconvenience would otherwise result, the Legislature may amend the general law regulating corporations, so as to obviate the difficulties that would otherwise arise, and allow these corporations to re-incorporate under the new law. But, in any event, it is better that some temporary inconvenience should be submitted to, rather than that one of the most valuable provisions of the fundamental law should be practically obliterated. No greater calamity could befall this State, than to open wide the door leading to careless or corrupt legislation in the form of special acts granting peculiar and onerous privileges to private corporations.

Another point made in the petition for a rehearing is that

by the third section of the Act of April 22, 1858, for the
incorporation of water companies, it is provided that "all
privileges, immunities, and franchises that may hereafter
be granted to any individual or individuals, or to any cor-
poration or corporations, relating to the introduction of
fresh water into the City and County of San Francisco, or
into any city or town in this State, for the use of the in-
habitants thereof, are hereby granted to all companies in-
corporated, or that may hereafter become incorporated for
the purposes aforesaid," and it is argued that by force of
this provision the rights and privileges which, on the next
day were granted to Ensign and his associates, were incor-
porated into, and became a part of the general law; and
that, therefore, the Ensign Act was not a special Act in the
sense of the Constitution. The substance of the proposi-
tion is that an Act, which on its face purports to be, and is
in fact a special Act, may be converted into a general Act
by a previous declaration of the Legislature that it shall be
so considered. If this theory be sound, nothing can be
easier than to evade the constitutional prohibition against
this class of special legislation. It would only be neces-
sary to pass a general law on the subject, and then declare
that all special Acts thereafter passed shall be deemed gen-
eral. But can the Legislature, by mere definition, change
the essential attributes of a special Act? Will it not re-
main special, whatever effect the Legislature may attribute
to it? The evil against which the Constitution provides
was the granting, by special Act, to private corporations,
peculiar rights and privileges, thus leading to careless and
corrupt legislation. The evil would not be mitigated, if the
Legislature should enact that all such special Acts should
inure to the benefit of corporations organized under the
general law. They would, nevertheless, remain special
Acts, within the purview of this clause of the Constitution.
The special Acts being void, could not be incorporated into
the general law.

It is contended, however, that even though the Ensign Act
be void, the defendant, as the successor in interest of the San
Francisco City Water Works, is charged with the duty of

furnishing to the city, free of charge, water for all municipal purposes, except for the sprinkling of streets. The San Francisco City Water Works was organized as a trading corporation, under the Corporation Act of 1853, as amended in 1855, and entered into a contract with the city to introduce water for the benefit of the inhabitants and for municipal uses. The contract, as originally entered into, was embodied in what is known as "Order No. 46 of the Board of Supervisors;" the fourth section of which provides that "the city and county, under the direction of the Board of Supervisors, shall be entitled to the free use of the water so introduced, for the purpose of extinguishing fires, and for the supply of all hydrants, fire-plugs, pumps and cisterns, and for all the public purposes of said city and county, except for sprinkling the streets; and the said city and county shall have the right, under the direction of the Board of Supervisors, to tap the pipes and connect the same with hydrants, fire-plugs, pumps, cisterns and other public works, at such places as they may deem proper." Section eight of said order is in these words: "It is hereby provided that should any other company, person or persons, receive permission to introduce water, for the purpose of supplying the city and county therewith, no more favorable terms shall be granted to such company or persons than to the company authorized under this order, without extending the same terms to the San Francisco City Water Works." Under this contract, water was introduced into the city in September, 1858, by the San Francisco City Water Works. But on the 22d day of April, 1858, a general law was passed for the incorporation of water companies, under which the Spring Valley Water Works was organized. This general law did not render it incumbent on corporations organized under it to furnish water to the city free of charge, except "in case of fire or other great necessity." The complaint avers that before and after the 13th of February, 1865, the Spring Valley Water Works was, and yet is, engaged in the business of introducing water into the city; and that on that day the San Francisco City Water Works conveyed and transferred

to the Spring Valley Water Works all its property, franchises, rights and privileges, including the right to introduce water into the city; and that the Spring Valley Water Works has ever since held and exercised the rights and privileges under said orders and ordinances, and not otherwise. The answer admits the transfer, but denies that the Spring Valley Water Works exercises said rights and privileges, under said orders, and avers that the same are held and exercised under said orders as the same are modified by an Act of the Legislature of April 8, 1863. The first section of this Act provides that "in accordance with the recommendation of the Board of Supervisors of the City and County of San Francisco," expressed in certain resolutions of the Board, the San Francisco City Water-Works is discharged from its obligation to pay the City and County a certain percentage of its gross earnings. The second section provides that "should any other company, person or persons, excepting the City and County of San Francisco, receive permission to introduce water for the purpose of supplying the said City and County therewith, no more favorable terms shall be granted to such company, person or persons, than are now enjoyed by the San Francisco City Water Works, without extending the same to the latter company." This is, in substance, a mere ratification by the Legislature of section eight of Order No. 46.

Under these circumstances, the question arises: "What were the duties and obligations of the Spring Valley Water Works in respect to furnishing water for municipal uses free of charge?" By its act of incorporation it was only bound to furnish water free of charge "in case of fire or other great necessity." If it is now under any additional obligation, it is because it has succeeded to the obligations of the San Francisco City Water Works. But if no transfer had been made, what would now have been the obligation of the latter company in respect to furnishing water free of charge for general municipal uses? By section eight of order number forty-six, ratified by the Act of April 8, 1863, this company could have been subjected to no greater

burdens than were imposed upon any other corporation which was permitted to introduce water into the city. As we have seen, the Spring Valley Water Works had been permitted to introduce water, subject to no other obligation in this respect than to furnish it free of charge "in case of fire or other great necessity," and had in fact introduced it prior to February, 1865—the date of the transfer. It is apparent, therefore, that at the date of the transfer the San Francisco City Water Works had been relieved under section eight of order number forty-six, ratified by the Act of the Legislature, from any greater burdens in this respect than were imposed upon the Spring Valley Water Works. It was bound to furnish water free of charge only "in case of fire or other great necessity." The transfer to the Spring Valley Water Works, therefore, wrought no change in its obligations in this respect.

It has been suggested that the grant to the Spring Valley Water Works under the Ensign Act, was not a grant of corporate rights, but only an easement permitting the company to lay its pipes through the streets, subject to the performance of certain duties imposed by the Act. The argument is that an easement of this character is property, which it was in the power of the State to grant to an existing corporation as it might grant property to any corporation, coupled with such conditions as it saw fit to impose; and that this is not a grant of corporate rights within the purview of the Constitution. It is a conclusive answer to this proposition that the Ensign Act did not grant to the Spring Valley Water Works any easement of this character which it did not already possess under the general law, under which it was incorporated. By the fifth section of the general Act (Statutes 1858, p. 219) the company had the absolute right "to use so much of the streets, ways and alleys, in any town, city, or city and county, or any public road therein, as may be necessary for laying pipes for conducting water into any such town, city, or city and county, or through or into any part or parts thereof." The corporation already having this right, under its Act of incorporation, it is clear that the Ensign Act conferred upon it no additional

privileges in this respect. On the contrary, this Act attempts to limit the rights which the company already had, in this respect, by imposing upon it conditions not found in the general law; as, for example, that it shall lay down a certain number of feet of pipe within a specified time, and after the pipes are laid, shall place the streets in as good condition as they were before. Instead of granting a new easement, or enlarging that which the company already had, the only effect of the Ensign Act in this particular was an attempt to restrict the easement which the company already possessed. The Act must be read as though it had recited the fact that the corporation had already been organized under the general law which authorized it to lay down its pipes in the streets; and thereupon the Legislature proceeded, by special Act, to impose certain limitations upon the exercise of the right, coupled with the condition, that the corporation should furnish water for municipal uses, on terms different from those imposed by the general law, with the right, in a certain contingency, to charge higher rates for water than companies organized under the general law were allowed to charge. In other words, the Act conferred no new rights upon the corporation in respect to the use of the streets, but attempted to limit those it already had, and then proceeds to impose upon it certain duties, and endows it with certain immunties not belonging to corporations formed under the general law. It is clear, therefore, that there is no plausible pretext for the assertion that the Ensign Act conferred upon the corporation any new or additional easement in respect to the use of the streets; and, if valid, its only legal effect was to impose certain duties and confer certain rights upon the corporation essentially different from those appertaining to other similar corporations organized under the same general law. As we have already seen, this cannot be done, under our Constitution, by special Act. Other sufficient reasons might be assigned in support of our conclusions on this branch of the case. But it is sufficient for the present to say, that the Ensign Act did not confer upon the Spring Valley Water Works any new or enlarged easement

in respect to the use of the streets; and the argument founded on the opposite hypothesis, must of course fall to the ground.

These views are decisive, I think, of the question under consideration.

But there are other reasons not less cogent why the proposition cannot be maintained. A private person can certainly grant to a corporation a right of way over his land, or any property, which, under its charter, the corporation is competent to take; and upon such terms and conditions as may be agreed upon. It is equally true that the State, in its capacity of a proprietor of lands, may do the same thing. It may, in that capacity, grant to a railroad corporation a right of way over lands belonging to the State, on such terms and conditions as it sees fit to impose. In these cases it is merely a matter of contract between parties capable of contracting, in respect to certain rights of property. But the State has no proprietary interest in the streets of a city, dedicated to public use. In its capacity as a sovereign, it may regulate the use, or abolish it altogether. (*Polack* v. *San Francisco Orphan Asylum, ante* p. 490.) But, as a general rule, the fee is in the owners of the adjoining lands on each side, to the centre of the street, and the State can only regulate and control the easement which the public has over the land. When the State grants to a private corporation an easement over the streets, not common to the public at large, it acts in its sovereign capacity and grants a franchise, which enters into and forms an essential element in the corporate powers of the corporation; which becomes entitled to the right, not because the State has parted with any proprietary interest in the land, but because in its sovereign capacity, having the control of public highways, it has granted to the corporation a franchise, entitling it to an easement over the streets not common to the general public. This is purely a grant of corporate power, and nothing more or less, and, as we have already seen, such rights cannot be conferred by special Act. But even if it be conceded that the right to the use of the streets may be granted by special Act, still the Ensign Act must fail, because the right to

use the streets is inseparably blended with the grant of other rights, and the imposition of certain burdens, which are in plain violation of the Constitution. As, for example, the right in a certain contingency to charge higher rates for water than other corporations organized under the same general law, and the imposition of greater burdens upon the company, than are imposed by the general law. It is a well settled rule, that where a portion of an Act is constitutional and another portion is unconstitutional, if the two are so inseparably blended together as to make it clear that either clause would not have been enacted without the other, the whole Act must fall. It is perfectly clear that such is the condition of this Act, and that all its provisions must stand or fall together.

We are satisfied that these views are in strict accordance with the letter and spirit of the Constitution. On the opposite theory, the Legislature, by special Act, may grant to a railroad corporation the right to lay down its tracks in the streets on condition that it supply the inhabitants with water or gas, or keep the streets in repair at a specified price, thus opening the door to corrupt and vicious legislation, against which the Constitution has so carefully guarded.

Rehearing denied.

McKINSTRY, J., concurring :

The general law providing for the incorporation of Water Companies took effect April 22, 1858; the "Ensign Act" was approved the next day.

The latter did not purport to confer the franchises therein granted on Ensign and his associates as individuals, but attempted to confer them on a corporation to be formed by Ensign and his associates when (or immediately after) such corporation should be formed under the general law.

I agree with Mr. Justice CROCKETT and with Mr. Justice RHODES, that the Legislature can neither pass a special Act granting powers or privileges to a particular corporation cre-

ated under the general law, which are not enjoyed by all other like corporations under the same law, nor pass a special Act limiting, or burthening with peculiar conditions, the rights or powers acquired by a particular corporation from the general law.

We are to ascertain the rights, privileges, powers, duties, and obligations of the Spring Valley Water Company, by reference only to the general law under which it was incorporated, and as if the Ensign Act had never been passed.

All corporations created under the general law acquired the right to charge such rates for water supplied to consumers as should be fixed by the commissioners to be appointed as therein provided. The Ensign Act attempted to guarantee to the Spring Valley Water Works twenty per cent. per annum on the capital by that company invested, by declaring that the commissioners should never fix the rates so low as to yield less than such twenty per centum.

The general law required all water companies to furnish water to the extent of their means, and free of charge, to the city or town to which water was conducted, "in case of fire or other great necessity." I express no opinion as to the precise meaning of the phrase "other great necessity." On the former appeal, and before I came to the bench, it was held by all the Justices qualified to sit in this case that these words did not include every municipal purpose. I shall assume that the construction given by the Court is correct. At a time, then, when the defendant—in common with all other corporations formed under the general law—was under obligation to furnish water to the city, into which water was conducted, "in case of fire or other great necessity," the Ensign Act attempted to impose upon the defendant the additional obligation to supply water to the city for all "other municipal purposes."

The Legislature could neither confer a benefit nor impose an obligation on the Spring Valley Water Works not conferred or imposed on all water companies by the general law. To confer a special benefit or impose a special obligation would be equally destructive of the uniformity which it is the object of section thirty-one, of Article IV. of the Constitution to secure.

I do not think the fact that the franchise to deliver water and charge tolls, or that the conduits of the company or. right to use the streets, may constitute "property" subject to taxation, should influence the decision of the present case.

Assuming that a grant by the sovereign of the privilege of laying down mains and pipes in the public streets—an incident inseparably connected with the franchise to charge tolls for water—can be considered as a grant by the owner of the fee of an "interest in real estate," (a proposition to which I cannot assent,) the defendant was entitled to such interest in real estate by virtue of its incorporation under the general law, before the Ensign Act was by its terms to take effect. That act, if valid, could not operate a grant with a certain condition of property of which the defendant was already the owner, without the condition. To sustain the Ensign Act, in the particular under consideration, it must be held that all of a class of corporations being in the enjoyment of certain franchises and subject to certain obligations under a general law, the Legislature can relieve one of the corporations of a portion of these obligations, or add to the burthen imposed on all, additional obligations binding on one alone.

The rights and duties of all corporations formed under the general law providing for the incorporation of water companies, are fixed and determined by its terms, and can only be changed or modified by amendment of the general law. And every such amendment must be made applicable to all corporations created under the general law.

I agree with Mr. Justice Crockett, that the validity of the Ensign Act is directly and necessarily involved in the decision of the present case, and I agree with the conclusions which he has reached in respect to the other questions discussed in his opinion, and in the order denying rehearing.

Mr. Chief Justice Wallace, having been of counsel for the plaintiff, took no part in the decision.

· RHODES, J., dissenting:

The proposition that section thirty-one, of Article IV, of the Constitution, prohibits the passage of special Acts granting corporate powers to corporations, other than those created for municipal purposes; that this inhibition extends as well to a special Act conferring a particular corporate power, as to an Act providing for the entire organization of a particular corporation—is, in my judgment, fully sustained by the opinion of Mr. Justice CROCKETT; but, while concurring generally in his argument, I am of the opinion that the record does not present the question. There may be, and in my opinion there are, provisions in the Ensign Act, which are obnoxious to the constitutional objection just mentioned—such as the provision for fixing higher rates than other corporations are, by the general Act, allowed to charge—but they do not affect the other provisions of the Act. The Act grants to Ensign, his associates and assigns, the right to lay down water-pipes, etc., in the streets of the city, upon certain terms and conditions. Is this a grant of corporate power? In my opinion, it is not. Time will not permit me to enter into an elaborate discussion of this question; and, indeed, I think it unnecessary, for the question seems to lie in a narrow compass. A private person cannot grant to a corporation corporate power, but he may grant to it property, or rights in property, necessary or proper for the use of the corporation, unless it be forbidden by positive law or necessary implication, from taking such property or rights in property; and it is not a grant of corporate power. And such a grant may be on such terms and conditions as the parties may agree to, provided they are not in contravention of law. For instance, a lot-owner in the city might grant to the corporation, when authorized, as contemplated by the Ensign Act, the right to lay down water-pipes over his lot, in consideration of the payment of a sum of money, or the supply of a certain amount of water, or of all the water he might need for a certain purpose. The State might make the same grant in respect to land held by it, and on a like

consideration. The State, to the extent of its control over the highways and streets within the State, may make grants of the like character. Such grants, whether made by private persons or the city, or the State, are not grants of corporate power, but are mere easements.

The State may, in my opinion, grant to a corporation any property which a private person might, if he was its owner; the grant may be made on the same terms and conditions that a private person might exact. In respect to grants of that character, the constitutional provision in question does not impose greater limitations upon the power of the State, than upon that of a private person. I do not understand that a grant, whether by a private person, or the city, or the State, to a street railroad company, of a right to extend the track of its road, whether with or without exacting conditions, or a consideration, is in violation of the provision of the Constitution in question. Our statute books are full of Acts making grants of that character. The acts granting the right of way to street railroad companies over certain streets, are familiar instances; also the acts granting to certain railroad companies subsidies, lands, and the right of way over certain streets in cities therein named; and grants of subsidies to certain telegraph companies, and many other grants that might be mentioned. In any of those cases, a private person owning the thing granted, might have made the grant, and have annexed conditions of the same character as those mentioned in the acts referred to; and whether made by the State or private persons, the grants would not confer corporate power. In this case the right granted is a right of way—a mere easement—an interest in land (Appeal of N. B. & M. R. R. Co., 32 Cal. 505), and in my opinion, it is very clear, that the grant is not prohibited by the Constitution; that the Legislature had competent power to annex to the grant the conditions mentioned in the third section of the Ensign Act, and that they are valid and binding on Ensign, his associates and assigns.

If it be held, as is suggested, that the legislative grant of the easement to Ensign, his associates and as-

signs, was void, because the right to acquire the same ease-
ment had been granted by the general law, and that the
terms and conditions upon which the grant was made fail
because the grant fails, then clearly the constitutional ques-
tion in respect to the grant of corporate power does not
arise in the case. But I do not understand that the grant
in this case is void, for the reason suggested; and not be-
ing void, the Legislature had competent authority to pre-
scribe any terms and conditions which were not prohibited
by paramount law.

If the Legislature has the power, on making the grant of
an easement to impose terms or conditions, they cannot, in
my opinion, be held to be repuguant to the constitutional
provision in question, on the ground that they are more
onerous than those prescribed by the general law. The
principal power granted to water companies is the power to
collect rates for the supply of water. The condition here,
to supply the municipality with water for certain purposes,
certainly does not enlarge that power, nor, in my opinion,
does it in any manner touch or relate to any power granted
to such corporations. The right attempted to be granted, to
collect higher rates than those which may be fixed for other
corporations, is, in my opinion, severable from the other
terms and conditions; and they are not void because it is
void.